Priority
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

ENTERED
CLERK. U.S. DISTRICT COURT

FEB - 8 2007

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

FILED - WESTERN DIVISION
CLERK. U.S. DISTRICT COURT

FEB - 7 2007

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

ANGELA MEDINA, an individual,

        Plaintiff,

        v.

MULTALER, INC. dba YON-KA PARIS
COMPANY, a Delaware corporation;
HERVE PONTACQ, an individual,; and
DOES 1 through 50, inclusive,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

CASE NO. CV 06-00107 MMM (AJWx)

ORDER SUSTAINING DEFENDANTS'
OBJECTION TO PLAINTIFF'S
EVIDENCE OF "PREGNANCY EMAIL"

## I. INTRODUCTION

    Defendants Multaler, Inc. ("Yon-Ka") and Herve Pontacq ("Pontacq") have asserted a number of evidentiary objections in response to plaintiff Angela Medina's ("Medina") opposition to their motion for summary judgment. Most of the objections are addressed in the court's order on the summary judgment motion. This order addresses defendants' objection to Medina's testimony that Pontacq sent her an email stating that her pregnancy was "bad" or "bad timing" for the company.

129

## II. DISCUSSION

**A.    Medina's Evidence Regarding The "Pregnancy Email"**

In her declaration and deposition testimony, Medina asserts that she received an email from Pontacq in late September 2004 congratulating her on her pregnancy, but stating that the pregnancy was "bad" or "bad timing" for the company.[1] Medina contends she was appalled by the email and showed it to her husband in disbelief.[2] She asserts she later discussed the email with Pontacq, who explained that he did not mean to imply anything negative about her pregnancy.  Pontacq made no other negative comments about Medina's pregnancy after this conversation.[3] When questioned about the email at his deposition, Pontacq said he did not recall whether or not he had sent such a communication.[4] Defendants object to evidence of Medina's evidence of the email on the grounds that it violates the best evidence rule and fails to comply with Rule 56(e) of the Federal Rules of Civil Procedure.

---

[1] Plaintiff's [Proposed] Statement of Genuine Issues in Opposition to Motion for Summary Judgment ("Pls.' Facts"), ¶¶ 97, 131; Defendants' [Proposed] Statement of Undisputed Facts and Conclusions of Law ("Defs.' Facts"), ¶¶ 97, 131; Declaration of Angela Medina ("Medina Decl."), ¶ 62; Declaration of Alexandra M. Steinberg Re: Plaintiff's Response to Defendant's Objection to Plaintiff's Evidence of 'Bad Timing' Email in Support of Opposition to Defendant's Motion for Summary Judgment ("Steinberg Decl."), Exh. 3 (Deposition of Angela Medina ("Medina Depo.") at 474:9-476:12; 478:2-20).

[2] Medina Decl., ¶ 63.

[3] Defs.' Facts, ¶ 98; Pl.'s Facts, ¶ 98; Declaration of William O. Stein in Support of Defendants' Motion for Summary Judgment ("Stein Decl."), Exh. 30 (Deposition of Angela Medina, Volume II ("Medina Depo. II") at 395:7-396:11).

[4] Deposition of Herve Pontacq ("Pontacq Depo.") at 45:13-18 (Q: So did you send her an e-mail saying that her pregnancy was inconvenient for the company? A: I don't recall.  Q: So you could have? A: I don't recall").  According to Pontacq, the words "bad timing" in relation to Medina's pregnancy were spoken by Medina herself.  (See Steinberg Decl., Exh. 6 (Pontacq Depo. at 43:19-44:1 (asserting that Medina came to his office and told him "that she was pregnant and . . . that her timing was not the best for the company"); *id.* (Pontacq Depo. at 45:4-8 ("She apologized to me for failing the sell-a-thon which just occurred, that's when she came and told me about her pregnancy, and she apologized for her timing not being the best for the company with this new recruit onboard")).

2

## B.     The Best Evidence Rule

The best evidence rule is a longstanding common law doctrine that is codified in Rule 1002 of the Federal Rules of Evidence.  See *Seiler v. Lucasfilms, Ltd.*, 808 F.2d 1316, 1318-20 (9th Cir. 1986) ("*Seiler II*") (discussing the history and application of the best evidence rule), cert. denied, 484 U.S. 826 (1987).  The rule states: "To prove the content of a writing . . . the original writing . . . is required, except as provided in these rules or by Act of Congress."  FED.R.EVID. 1002.  By its terms, the rule does not bar secondary evidence offered for any purpose other than to "prove the content" of the writing.  See, e.g., *Fireman's Fund Ins. Co. v. Stites*, 258 F.3d 1016, 1023 (9th Cir. 2001) (holding that checks and billing records submitted by insurers in support of a motion for summary judgment against an attorney who allegedly violated RICO by inflating legal fees should not be excluded under the best evidence rule because they were not offered to prove the content of the writings); *United States v. Mayans*, 17 F.3d 1174, 1185 (9th Cir. 1994) (holding that the trial court improperly sustained best evidence objections to questions that sought to have witnesses state their understanding of plea agreements because the witnesses' understanding of the agreements was relevant regardless of their content).

Because Medina offers her declaration and deposition testimony to prove that Pontacq wrote, in an email, that her pregnancy was "bad" or "bad timing" for the company, her testimony is offered "[t]o prove the content of a writing," and falls within the scope of the best evidence rule.  A best evidence objection is particularly appropriate where, as here, the alleged writer of the original document does not acknowledge the document's existence.  Pontacq's assertion that he does not remember writing such an email, combined with Medina's inability to produce the email, triggers both of the evidentiary concerns that underpin the best evidence rule, i.e., "guard[ing] against incomplete or fraudulent proof," and preventing inaccuracies that necessarily occur when witnesses are asked to recollect the specific words of a document.  *Seiler II*, 808 F.2d at 1319; see *id.* ("The modern justification for the rule has expanded from prevention of fraud to a recognition that writings occupy a central position in the law.  When the contents of a writing are at issue, oral testimony as to the terms of the writing is subject to a greater risk of error than oral testimony as to events or other situations" (citations omitted")); see also *United States v.*

1    *Holton*, 116 F.3d 1536, 1545 (D.C. Cir. 1997) (the best evidence rule "is a mechanism to prevent

2    fraud or mistransmission of information, i.e., to ensure accuracy"); *United States v. Ross*, 33

3    F.3d 1507, 1513 (11th Cir. 1994) ("The purpose of the best evidence rule is to prevent inaccuracy

4    and fraud when attempting to prove the contents of a writing"); *United States v. Alexander*, 326

5    F.2d 736, 742 (4th Cir. 1964) ("'These reasons [for the best evidence rule] are simple and

6    obvious enough, as dictated by common sense and long experience. They may be summed up in

7    this way: (1) As between a supposed literal copy and the original, the copy is always liable to

8    errors on the part of the copyist, whether by wilfulness or by inadvertence; this contingency

9    wholly disappears when the original is produced. . . . (2) As between oral testimony, based on

10    recollection, and the original, the added risk, almost the certainty, exists, of errors of recollection

11    due to the difficulty of carrying in the memory literally the tenor of the document,'" quoting 4

12    WIGMORE, EVIDENCE § 1179 (3d ed. 1940)).

13        **C.    Exceptions To The Best Evidence Rule**

14        Recognizing that the best evidence rule is a rule of preference and not a rule of absolute

15    exclusion, the Federal Rules of Evidence permit secondary evidence in limited circumstances.

16    See 6 WEINSTEIN'S FEDERAL EVIDENCE, § 1004.01, at p.1004-7 (2006) (describing the best

17    evidence rule as "one of preferences, not absolute exclusion"). As a result, Rule 1004 sets forth

18    four exceptions to the rule. It permits courts to admit secondary evidence where (1) "[a]ll

19    originals are lost or have been destroyed, unless the proponent lost or destroyed them in bad

20    faith"; (2) "[n]o original can be obtained by any available judicial process or procedure"; (3) [a]t

21    a time when an original was under the control of the party against whom offered, that party was

22    put on notice . . . that the contents would be a subject of proof at the hearing, and that party does

23    not produce the original at the hearing"; or (4) the writing "is not closely related to a controlling

24    issue." FED.R.EVID. 1004.

25        In her effort to secure admission of her testimony regarding the contents of the email,

26

27

28

1 Medina has invoked the first and second exceptions.[5] She insists that she does not have a copy

2 of the email and reports that she has been unable to obtain a copy from defendants through

3 discovery, even though the email was sent from, and received at, accounts located on Yon-Ka's

4 electronic server.

**1.    The Diligent Search Requirement**

6       To establish that the email is lost, destroyed, or unavailable, Medina must "demonstrate

7 that [she] has made a diligent but unsuccessful search and inquiry for the missing [original]."

8 *Burt Rigid Box, Inc. v. Travelers Prop. & Cas. Corp.*, 302 F.3d 83, 91-92 (2d Cir. 2002); see

9 also *United States ex rel. Magid v. Wilderman*, No. Civ. A. 96-CV-4346, 2004 WL 1987219, *4

10 (E.D. Pa. Aug. 18, 2004) (party seeking to admit evidence under Rule 1004(1) and (2) must show

11 that it made reasonable and diligent efforts to locate and obtain the original by judicial process,

12 citing *Burt Rigid Box*).   While not expressly stated in Rule 1004, "a diligent search is an avenue

13 by which the larger issue of the document's destruction [or loss] may be proved." *United States*

14 *v. McGaughey*, 944 F.2d 1067, 1071 (7th Cir. 1992), cert. denied, 507 U.S. 1019 (1993).

15       Indeed, absent evidence of actual destruction, a reasonable and diligent search is typically

16 the only way to establish that a document has been lost or is unavailable.   For that reason, courts

17 generally hold that an unsuccessful search for the original is a prerequisite to invoking Rule

18 1004(1).   See 6 WEINSTEIN'S FEDERAL EVIDENCE, § 1004.11[1], at p.1004-15 (2006) ("Except

19 for those pre-Rules cases in which circumstances excused such an inquiry, every showing of loss

20 has been based upon evidence of an unsuccessful search"); MCCORMICK ON EVIDENCE, § 237 at

21 _____

22   [5]Steinberg Decl., ¶ 4 ("Defendants' objection to Plaintiff's evidence of the bad timing email on the best evidence rule should therefore be overruled under either Fed.R.Evid. 1004(1)

23 or (2)").   Medina does not rely on the third exception, which applies to originals "under the control of the party against whom offered" if that party was put on notice that the contents would

24 be "a subject of proof at the hearing, and that party does not produce the original at the hearing."

25 FED.R.EVID. 1004(3).   Any attempt to assert this exception, moreover, would fail, as Medina cannot show that defendants are in possession of the email. See Christopher B. Mueller and Laird

26 C. Kirkpatrick, FEDERAL EVIDENCE, § 579 (2d ed. 2006) ("The requirement that the original be

27 in the possession or 'control' of the adverse party may be satisfied by evidence of actual possession, or custody by an agent or employee of the party who would give up the original upon

28 his request, including, of course, the party's trial counsel").

5

1   715 (3d ed. 1984) ("Loss or destruction may sometimes be provable by direct evidence, but more

2   often the only available evidence will be circumstantial, usually taking the form that appropriate

3   search for the document has been made without discovering it"); *McGaughey*, 977 F.2d at 1071

4   ("Of course, before secondary evidence may be used, it must be demonstrated that the original

5   has actually been destroyed. Unless someone testifies that he or she personally destroyed or

6   witnessed the destruction of a document, such proof will ordinarily be circumstantial").

7        Similarly, a party seeking to show that an original document cannot "be obtained by any

8   available judicial process or procedure" must demonstrate that it has made reasonable and diligent

9   use of all judicial process and procedures that are available.  See *Simpson v. Dall*, 70 U.S. (3

10  Wall.) 460, 475 (1865) (a party seeking admission of secondary evidence must show that it "has,

11  in good faith, exhausted, in a reasonable degree, all the sources of information and means of

12  discovery which the nature of the case would naturally suggest"); *Cartier v. Jackson*, 59 F.3d

13  1046, 1048 (10th Cir. 1995) (refusing to admit secondary evidence of a demonstration tape

14  because plaintiff did not subpoena record companies that received the tape).

15       As the party offering secondary evidence, Medina bears the burden of showing that "a

16  diligent, bona fide and thorough search was made without success." 6. WEINSTEIN'S FEDERAL

17  EVIDENCE, § 1004.11[4], at p.1004-19 (2006); see also *Seiler v. Lucasfilm, Ltd.*, 613 F.Supp.

18  1253, 1260 (N.D. Cal. 1984) ("*Seiler I*") ("The burden of proving loss or destruction under Rule

19  1004 is on the proponent of the evidence," citing WEINSTEIN'S FEDERAL EVIDENCE), aff'd., 808

20  F.2d 1316 (9th Cir. 1986).

21       Although the "diligent search" requirement is not satisfied merely by a showing that "it

22  is doubtful whether or not the [original] document exists,"         *Sellmayer Packing Co. v.*

23  *Commissioner*, 146 F.2d 707, 710 (4th Cir. 1944), "loss or destruction of the document . . .

24  [need not be] proved beyond all possibility of a mistake." *United States v. Sutter*, 62 U.S. (21

25  How.) 170, 175 (1858); see also *Western, Inc. v. United States*, 234 F.2d 211, 213 (8th Cir.

26  1956) ("The best evidence rule does not require proof of the nonexistence of a document beyond

27  possibility of mistake"). Rather, "the intensity of the search needed to prove that an instrument

28  has been lost or destroyed varies with the instrument's importance." 6 WEINSTEIN'S FEDERAL

1    EVIDENCE, § 1004.12[3], at p.1004-23 (2006); see also *Sylvania Elec. Prods., Inc. v. Flanagan*,

2    352 F.2d 1005, 1008 (1st Cir. 1965) ("There is no universal or fixed rule that determines the

3    sufficiency of the proof required to show that a reasonable or diligent search has been made.

4    Each case is governed in large measure by its own particular facts and circumstances. . . .

5    [W]here the missing original writings in dispute are the very foundation of the claim, . . . more

6    strictness in proof is required than where the writings are only involved collaterally").

7         Whether or not a party has satisfied the "diligent search" requirement is a question

8    committed to the court's discretion.  See *Willhoit v. C.I.R.*, 308 F.2d 259, 265 (9th Cir. 1962)

9    ("The sufficiency of the preliminary proof of diligence is addressed to the sound discretion of the

10   trial judge, whose determination will not be disturbed in the absence of clear evidence of mistake

11   amounting to an error of law"); *Ellis v. United States*, 321 F.2d 931, 933 (9th Cir. 1963) ("The

12   sufficiency of the foundation [for introducing secondary evidence] is a matter resting largely

13   within the discretion of the trial court"); see also *Burt Rigid Box*, 302 F.3d at 92 ("The 'diligence'

14   requirement is not a matter to be determined by the fact finder.  Rather, under Rule 104(a) of the

15   Federal Rules of Evidence, '[p]reliminary questions concerning . . . the admissibility of evidence

16   shall be determined by the court").  To assist it in making this determination, the court has

17   requested, and the parties have submitted, all discovery related to the existence of, and search for,

18   the pregnancy email.

19         **2.    Whether Medina Made A Diligent Search For The Email**

20        Medina asserts she does not have a copy of the pregnancy email, even though she produced

21   a CD-ROM containing more than 1,000 other emails sent and received during her employment

22   at Yon-Ka.[6]  At her deposition, she explained this apparent anomaly by stating that she used two

23   different email programs: Outlook and Citrix.   When she used Outlook, the software

24   automatically downloaded a copy of her emails onto her hard drive.  Some time prior to

25   November 2004, she transferred all of the emails that had been downloaded to her

26   _____

27        [6]See Declaration of Lauren K. Rifenbark in Support of Defendants' Response to the
     Court's Request for Additional Information ("Rifenbark Decl."), ¶ 4 and Exh. 1 (CD-ROM
28   containing emails produced by Medina).

7

1   company-issued laptop onto her home computer.[7]   These emails apparently make up the bulk of

2   the 1,000-plus emails she produced during discovery.   At certain times, however, technical

3   limitations required that Medina use Citrix, which did not permit her to download or print emails.

4   She contends she was using Citrix when she received the pregnancy email and that she did not

5   download or print a copy as a result.[8]   Nonetheless, Medina asserts, she did not delete the email

6   from her inbox, and it should be available on Yon-Ka's server.[9]

7           The question is whether Medina made reasonable and diligent efforts to obtain the email

8   from Yon-Ka.   Because Yon-Ka is a defendant, Medina could have used any and all of the

9   mechanisms provided by the Federal Rules of Civil Procedure to seek and/or compel production

10  of the email by the company.   The evidence shows, however, that Medina never served a request

11  for documents on the company that asked for the "pregnancy email."

12          Medina, in fact, served *no* requests for production of documents on Yon-Ka.   Given her

13  assertion that the email should be available on Yon-Ka's server, Medina's failure to request its

14  production is inexplicable, and weighs against a finding that she made a reasonable and diligent

15  search for the document.   See *Rogers v. Durant*, 106 U.S. 644, 645-46 (1883) ("The plaintiff,

16  having made no inquiry in the place in which the drafts would be most likely to be found utterly

17  fails in his attempt to prove their loss").

18          Medina did serve requests for production of documents on Pontacq.   None of these

19  requests, however, sought production of the pregnancy email.   The request that came closest to

20  asking   for the document sought     "[a]ny and all DOCUMENTS CONCERNING any

21  CONVERSATIONS you had with PLAINTIFF regarding the subject of PLAINTIFF's second

22  pregnancy that began in 2004."[10]   The "pregnancy email," however, is not a conversation but a

23

_____

24          [7]Medina Depo. at 467:20-25.

25          [8]*Id.* at 468:17-21; 469:24-470:5; 471:18-472:1.

26          [9]*Id.* at 460-73.

27          [10]Steinberg Decl., Exh. 11 (Plaintiff's Request for Production of Documents, Set One).

28  Pontacq responded that he would "produce any responsive documents" he had in his "possession,

1    written communication.

2        Medina relies heavily on a request for admission she propounded to Yon-Ka that read: "A

3    few days after learning that PLAINTIFF was pregnant in September 2004, PONTACQ sent an

4    e-mail to PLAINTIFF stating that her pregnancy was 'inconvenient for the company'." Yon-Ka

5    denied the request.[11]  In concurrently served special interrogatories, Medina asked: "If you

6    'denied' [plaintiff's request for admission regarding the email] . . . please state all facts that

7    support your denial." Yon-Ka responded: "Defendant does not have a record of the alleged

8    email, and Plaintiff has not produced it in discovery."[12]

9        Yon-Ka's admission and interrogatory response are not as significant as Medina contends

10   because she asked Yon-Ka to admit that Pontacq sent an email stating that her pregnancy was

11   "*inconvenient for the company*." In her complaint, her declaration and her deposition testimony,

12   Medina asserted that Pontacq's email stated her pregnancy was "bad" or "bad timing" for the

13   company, not that it was "inconvenient."[13] Whether deliberately or inadvertently, Medina sought

14

15   custody, or control." (Steinberg Decl., Exh. 12 (Herve Pontacq's Response to Plaintiff's Request

16   for Production of Documents, Set One)).

17       [11]Steinberg Decl., Exh. 5 (Multaler's Response to Requests for Admission, Set One)).

18       [12]Steinberg Decl., Exh. 4 (Multaler's Response to Plaintiff's Special Interrogatories, Set

19   One)).

20       [13]See Complaint, ¶ 11 (alleging that Pontacq sent Medina an email stating that her
     pregnancy was "bad for the company"); Steinberg Decl., Exh. 3 (Medina Depo. at 474:9-15 ("Q:

21   . . . . What exactly, to the best of your recollection, did that e-mail say? A: The e-mail said that
     – basically, he was congratulating me on my pregnancy but that it was bad timing for the

22   company"); *id*. (Medina Depo. at 475:7-476:2 ("Q: Tell me everything that you can recall that

23   was contained in that e-mail. . . . Q: Well, and as close to the words as you can and just every
     topic that was touched on. . . . Q: What did the e-mail say as fully as you can remember and as

24   specifically verbatim as you can remember? A: What I remember was that it was an e-mail from

25   Herve basically saying congratulations to me on my pregnancy. And then the other thing that I
     remember is that 'unfortunately, this is bad timing for the company'")); *id*. (Medina Depo. at

26   480:20-24 ("Q: Did he ever say anything else about – at any time about your pregnancy being bad

27   timing for the company? A: Well, we talked about that e-mail, as I just mentioned"));
     Declaration of Angela Medina ("Medina Decl."), ¶ 62 ("I received an e-mail from Pontacq, first

28   congratulating me on my pregnancy, but then saying that my pregnancy was 'bad' for the

1  to have Yon-Ka admit that Pontacq sent an email that was different than the one she recalled

2  receiving. Similarly, she requested that Pontacq produce documents that concerned conversations

3  rather than written communications. Finally, she failed completely to propound document

4  requests to Yon-Ka. Additionally, she failed to depose any of Yon-Ka's technical employees to

5  discover facts regarding the company's document retention policies, electronic backup

6  mechanisms, or its email deletion practices. Nor did she question Pontacq at his deposition

7  regarding his email deletion practices. As it would not have been difficult to frame more accurate

8  and/or targeted queries, and to take additional steps to determine whether any email Pontacq sent

9  could be accessed within Yon-Ka's system, Medina's failure to take these steps raises questions

10  regarding the authenticity of her secondary evidence and the diligence of her search.

11      The weakness of Medina's attempts to secure the original email, or discover information

12  suggesting that it no longer exists, is evident when one compares her efforts with defendants'

13  attempts to obtain the same email from Medina. Yon-Ka propounded a specific request asking

14  Medina for "[a]ny and all documents which support your contention that Mr. Pontacq sent you

15  an email wherein he stated that your pregnancy was 'bad for the company' as alleged in paragraph

16

---

17  company, or 'bad timing' for the company"); Plaintiff's Memorandum of Points and Authorities
18  in Opposition to Motion for Summary Judgment ("Opp.") at 7:15-20 ("around the end of
19  September 2004, Plaintiff received an e-mail from PONTACQ, first congratulating her on her
    pregnancy, but then saying her pregnancy was 'bad' for the company, or 'bad timing' for the
20  company"); Pls.' Facts, ¶ 131 ("Plaintiff received an e-mail from Pontacq, first congratulating
    her on her pregnancy, but then saying that her pregnancy was 'bad' for the company, or 'bad
21  timing' for the company").

22      Only halfway through the third day of Medina's deposition did she indicate that the email
    might have included the phrase, "inconvenient for the company," and then only because the
23  opposing attorney asked: "What – let me back up a step real quick. Again, on the e-mail –
    before we get into this next thing – did Mr. Pontacq write that it was inconvenient for the
24  company that you were going on pregnancy leave, or did he write that it was bad timing for the
25  company? What specifically did he write?" In response, Medina stated: "It may have been
    'inconvenient.' I – for some reason I remember 'bad timing,' but whatever it was, it was that it
26  was not good for the company." (*Id.* (Medina Depo. at 516:20-517:3)). It appears that the
    genesis of opposing counsel's question was Medina's request for admission, which used the word
27  "inconvenient," and which was inconsistent with her testimony that the email used the words
28  "bad" or "bad timing."

1   11 of your complaint."[14]  To ascertain why she could not produce a copy of the email, defendants

2   also questioned Medina at length during her deposition about her use of various email programs

3   and her practices with regard to printing and downloading emails.[15]

4          The lack of a diligent search might be excused if the email were only tangentially related

5   to Medina's case.  It is clear, however, that Medina's ability to prove that Yon-Ka discriminated

6   against her rests heavily on her allegation that Pontacq sent an email stating that her pregnancy

7   was "bad" or "bad timing" for the company.  In opposition to defendants' summary judgment

8   motion, Medina relied exclusively on two pieces of evidence to show discriminatory animus:

9   (1) Pontacq's "pregnancy email," and (2) her assertion that she "found out later that the Yon-Ka

10  directors in France . . . didn't like to hire women of child-bearing age[ ]," a sentiment that was

11  "well-known in the New Jersey office."  As explained in the court's order regarding defendants'

12  summary judgment motion, the latter evidence is inadmissible speculation and triple hearsay.[16]

13  It was thus imperative for Medina to proffer admissible evidence of the "pregnancy email" to

14  survive summary judgment.  Where "the missing original writing[ ] in dispute [is] the very

15  foundation of the claim, which is the situation in this case, more strictness of proof is required

16  than where the writings are only involved collaterally." *Flanagan*, 352 F.2d at 1008.  The notion

17  that "the intensity of search needed to prove that an instrument has been lost or destroyed varies

18  with the instrument's importance" to a particular case has well-established roots in case law.  6

19  WEINSTEIN'S FEDERAL EVIDENCE, § 1004.12[3], at p.1004-23 (2006).

20         In *Flanagan*, plaintiff alleged that defendant breached an oral agreement to pay him $13

21  per hour per truck to haul ledge material.  *Flanagan*, 352 F.2d at 1007.  As evidence of the

---

23  [14]Rifenbark Decl., Exh. 6 at 60 (Multaler's Request for Production of Documents, Set
    One).

24
25  [15]Steinberg Decl., Exh. 3 (Medina Depo. at 464-473).

26  [16]See Declaration of Lauren K. Rifenbark in Support of Defendants' Reply to Plaintiff's
    Opposition to Defendants' Motion for Summary Judgment ("Rifenbark Decl."), Exh. Medina
27  Depo. (Deposition of Angela Medina, Volume III ("Medina Depo. III") at 505:12-506:2)
    (explaining that "Jessica" told her that "Delphine" said that the Muhlethaler sisters had
28  commented they disliked hiring women of childbearing age because it was bad for business).

1   number of trucks and hours worked, plaintiff submitted his declaration, copies of bills sent to

2   defendant for work completed, and bills sent to plaintiff by other truckers for rental of the trucks.

3   *Id*. He did not, however, submit the tally sheets, or time sheets, that contemporaneously recorded

4   the number of trucks and hours worked. *Id*. The trial court admitted the secondary evidence and

5   the jury found for plaintiff. *Id*. The appellate court reversed and remanded the case for a new

6   trial on the grounds that the secondary evidence should not have been admitted without evidence

7   that plaintiff had made a reasonable, diligent, and unsuccessful search for the original tally sheets.

8   *Id*. at 1008. The court acknowledged that "[t]he best evidence rule should not be applied as a

9   mere technicality." *Id*. Because the tally sheets formed "the very foundation of [plaintiff's]

10  claim," however, "more strictness in proof" was required "to show that a reasonable or diligent

11  search has been made." *Id*.

12          The *Seiler I* court, which was later affirmed by the Ninth Circuit in *Seiler II*, addressed

13  a similar situation.  Plaintiff alleged that defendant, the creator and producer of *The Empire*

14  *Strikes Back*, copied some of his drawings for use in the film. *Seiler I*, 613 F.Supp. at 1254.  As

15  evidence of the drawings, he offered copies, reconstructions, and projections. *Id*.  Because he

16  gave no credible reason for the original drawings' destruction, the court excluded the secondary

17  evidence on the basis that plaintiff failed to establish the foundational prerequisites to admission

18  under Rule 1004 by showing that the originals were lost or destroyed without bad faith. *Id*. at

19  1262.  The court rejected plaintiff's argument that a more lenient standard should be used to

20  evaluate proof of loss or destruction in part because the drawings were "the 'very foundation' of

21  plaintiff's claim, a claim in which plaintiff seeks to have a jury compare the similarities between

22  plaintiff's work and defendants' work, and find the two to be 'substantially' or even 'strikingly'

23  similar.  In  making such a comparison, the importance of allowing a jury to view the plaintiff's

24  originals for color, size shading, line, and the like . . . is clear." *Id*.

25          As in *Flanagan* and *Seiler*, the "pregnancy email" is the "very foundation" of Medina's

26  claim that she suffered discrimination because of her pregnancy.  First, Medina cannot survive

27  summary judgment without it.  Second, were the case to go to trial, the email would undoubtedly

28  be a central piece of evidence argued to the jury, as it is the only direct evidence of discrimination

1   Medina has attempted to adduce.  Because Medina must demonstrate discriminatory animus on

2   defendants' part, the jury's ability to assess the email's context and tone would be critical in

3   weighing its probative value, just as the drawings in *Seiler* were critical to the jury's evaluation

4   of similarity between plaintiff's drawings and the drawings used in *The Empire Strikes Back*.

5   Given the critical importance of the email to Medina's discrimination claim, it is not unreasonable

6   to expect Medina to have conducted a thorough, careful, multi-faceted search for the original

7   document.   As noted, however, Medina's search appears to have been half-hearted, even

8   desultory.

9        In comparable situations, courts have excluded secondary evidence such as the testimony

10  Medina offers in place of the "pregnancy email."  In *Wilderman*, for example, the court excluded

11  secondary evidence of Health Care Financing Administration ("HCFA") claim forms offered by

12  a relator in a False Claims Act case.  The court recognized that the realtor "twice invoked the

13  judicial process in an attempt to obtain the . . . forms," but concluded that her efforts were neither

14  reasonable nor diligent because she (1) never objected to HCFA's production of secondary

15  evidence in response to her subpoena; (2) did not attempt to obtain the original documents from

16  HCFA before the close of discovery, despite the fact that the agency indicated that the original

17  might become available at some point; and (3) only moved for an order compelling production

18  of the original after defendant filed a motion *in limine* five weeks before trial.  *Wilderman*, 2004

19  WL 1987219 at * 5.

20       In *Cartier v. Jackson*, 59 F.3d 1046 (10th Cir. 1995), the circuit court affirmed a district

21  court's finding that plaintiff failed to conduct a diligent search for an original copy of her

22  demonstration tape, despite the fact that she attempted to locate the original by calling friends and

23  former colleagues; searching her residence and storage; and attempting unsuccessfully to contact

24  record companies that might have received her tape.  *Id.* at 1048.  The district court found these

25  efforts inadequate because she did not attempt to compel any of the record companies to respond

26  to her requests.  *Id.*  In reaching this result, the court rejected plaintiff's argument that it would

27  have been futile to subpoena the record companies because typically they return demo cassettes

28  immediately or destroy them to avoid exposure to copyright infringement claims.  *Id.*  The Tenth

13

1   Circuit affirmed the district court's conclusion that plaintiff's "*efforts* [were] insufficient,"

2   irrespective "of the speculated futility of the search."   *Id.* (emphasis original).   See also

3   *Harrington v. United States*, 504 F.2d 1306, 1313-14 (1st Cir. 1974) (affirming the district

4   court's finding that a search was insufficient to support the conclusion that a document was

5   unavailable; it was not enough that plaintiffs had "checked with" their corporation's receiver to

6   determine if he had a copy of the document, nor that they produced an "ambiguous" state court

7   document authorizing papers in the receiver's possession to be "disposed of").   Compare *New*

8   *York v. Blank*, 820 F.Supp. 697, 702-03 (N.D.N.Y. 1993) (proof of diligent efforts to obtain an

9   original insurance policy was shown where the proponent of secondary evidence propounded

10   interrogatories, requests for production of documents, and requests for admission on the issuer,

11   which admitted that the original was no longer in its custody), vacated on other grounds, 27 F.3d

12   783 (2d Cir. 1994).

13       Like the relator in *Wilderman*, Medina failed to make reasonable efforts to obtain the email

14   by using the discovery tools available to her under the Federal Rules of Civil Procedure.  Most

15   disturbing is her failure to serve *any* document requests on Yon-Ka, her propounding of discovery

16   requests that employed inapposite language, and her failure to depose people within Yon-Ka who

17   could testify to document and email retention practices.  Combined with her failure to follow up

18   when defendants failed to produce the email, Medina's limited efforts suggest that she herself did

19   not believe a search would turn anything up.  As in *Cartier*, therefore, the court concludes that

20   Medina's efforts to obtain the email were insufficient.  Although a truncated search might be

21   sufficient in cases where the original document serves only a collateral purpose, it is clearly not

22   enough here, where the "pregnancy email" forms the core of Medina's discrimination claim.

23   Accordingly, the court concludes that Medina did not "in good faith, exhaust[ ], in a reasonable

24   degree, all the sources of information and means of discovery which the nature of the case would

25   naturally suggest, and which were accessible to h[er]."  *Dall*, 70 U.S. at 475.

26   **D.   Rule 56(e)**

27       While it is true that "a party does not necessarily have to produce evidence in a form that

28   would be admissible at trial [to survive summary judgment]," its evidence must nonetheless satisfy

1  the requirements of Rule 56 of the Federal Rules of Civil Procedure.  *Block v. City of Los*

2  *Angeles*, 253 F.3d 410, 418-19 (9th Cir. 2001); *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th

3  Cir. 2003) (same, citing *Block*).

4         Medina's evidence fails to comply with even this comparatively lenient requirement.  Rule

5  56(e) states that affidavits must set forth facts that "would be admissible in evidence" and that

6  "copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served

7  therewith."  FED.R.CIV.PROC. 56(e); see also *Orr v. Bank of America*, 285 F.3d 764, 773 (9th

8  Cir. 2002) (evidence must be admissible to be considered at summary judgment); *School Dist. No.*

9  *1J, Multnomah County, Or. v. ACandS, Inc.*, 5 F.3d 1255, 1261 (9th Cir. 1993) ("Rule 56(e)

10  requires that documents relied upon in an affidavit presented in a summary judgment motion or

11  opposition thereto be attached to the affidavit"); *Canada v. Blain's Helicopters, Inc.*, 831 F.2d

12  920, 924 (9th Cir. 1987) (rejecting a party's argument that documents did not need to be

13  authenticated to be considered in ruling on a summary judgment motion, the court noted *Celotex*'s

14  statement that evidence need not be in a form that would be admissible at trial to be used in

15  opposing summary judgment, but observed that "[t]he *Celotex* court . . . was referring to the

16  other means enumerated in Rule 56(c) for persuading the court that summary judgment is

17  inappropriate including affidavits, which are evidence produced in a form that would not be

18  admissible at trial.  The quoted sentence upon which Canada relies should not be read to allow

19  evidence inadmissible in form if such evidence is not allowed by Rule 56(c)").

20         As noted, the facts Medina recites in her declaration are not admissible, as they violate the

21  best evidence rule.  Moreover, she has not attached the email on which her declaration relies.

22  Although she asserts that the email is lost, destroyed, or unavailable by judicial process, she

23  cannot show that she made a reasonable and diligent effort to find the original email.  Therefore,

24  the statements in her declaration regarding Pontacq's "pregnancy email" must be excluded.  See

25  *ACandS*, 5 F.3d at 1262 (district court did not abuse its discretion in refusing to consider

26  affidavits that referred to documents that were not attached); *Peterson v. United States*, 694 F.2d

27  943, 945 (3d Cir. 1982) (failure to attach a key document to an affidavit violated Rule 56(e) and

28  made summary judgment improper).

1

## III.  CONCLUSION

2          For the reasons stated, the court sustains defendants' evidentiary objection to Medina's

3   secondary evidence regarding the "bad timing" email.

4

5   DATED: February 7, 2007                        _____
                                                   MARGARET M. MORROW
6                                                  UNITED STATES DISTRICT JUDGE

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28