Priority _____
Send _____ ✓
Enter _____ ✓
Closed _____
JS-5/JS-6 _____
JS-2/JS-3 _____
Scan Only _____



ENTERED
CLERK, U.S. DISTRICT COURT

FEB – 8 2007

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY



FILED - WESTERN DIVISION
CLERK, U.S. DISTRICT COURT

FEB – 7 2007

CENTRAL DISTRICT OF CALIF.
BY

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANGELA MEDINA, an individual, | ) CASE NO. CV 06-00107 MMM (AJWx) |
| Plaintiff, | ) |
| | ) |
| v. | ) ORDER GRANTING DEFENDANTS' |
| | ) MOTION FOR SUMMARY JUDGMENT |
| MULTALER, INC. dba YON-KA PARIS | ) |
| COMPANY, a Delaware corporation; | ) |
| HERVE PONTACQ, an individual,; and | ) |
| DOES 1 through 50, inclusive, | ) |
| | ) |
| Defendants. | ) |

On November 1, 2005, plaintiff Angela Medina filed a first amended complaint in the Los Angeles Superior Court against her former employer, Multaler, Inc. dba Yon-Ka Paris Company ("Yon-Ka USA"), and her former supervisor, Herve Pontacq, alleging that she had been constructively discharged because of her pregnancy. Medina contends that, over the course of several months, defendants caused her to fail as a sales manager by criticizing her poor sales performance, repeatedly reconfiguring the territories for which she was responsible, and removing key accounts from her management. The complaint alleges wrongful retaliatory termination in violation of public policy, and four claims under California's Fair Employment and Housing Act ("FEHA"): violation of pregnancy leave rights, sex discrimination, retaliation, and

130

failure to prevent discrimination.[1]  Defendants removed the action to federal court on January 6, 2006, invoking the court's diversity jurisdiction.  They have now moved for summary judgment.

# I.  FACTUAL BACKGROUND

## A.   Yon-Ka USA

Multaler & Cie is a French skin care company that does business as Yon-Ka France and Yon-Ka USA.[2]  Together, the French company and its American subsidiary sell luxury skin care products in five-star hotel spas and in skin care clinics.[3]

Herve Pontacq is Chief Operating Officer (COO) of Yon-Ka USA; he works from the company's national corporate headquarters in Rockaway, New Jersey.[4]  Most of the company's employees are women between the ages of 25 and 35, who are assigned sales territories for which they are responsible.[5]  One of Pontacq's duties as COO is to ensure that Yon-Ka USA maximizes the potential of its sales force in each territory.  If he believes that a territory is underperforming, he alerts the salespersons responsible for the territory and strategizes with them to correct the situation.[6]

Defendants contend that, during the time Medina worked for the company, Pontacq

---

[1]All five causes of action are pled against Multaler.  Pontacq is named only in the causes of action for retaliation in violation of FEHA and for wrongful retaliatory termination in violation of public policy.

[2]Declaration of Herve Pontacq ("Pontacq Decl."), ¶ 3.

[3]*Id.*

[4]*Id.*, ¶ 2.

[5]Defendants' [Proposed] Statement of Undisputed Facts and Conclusions of Law ("Defs.' Facts"), ¶¶ 4-5; Plaintiff's [Proposed] Statement of Genuine Issues ("Pl.'s Facts"), ¶¶ 4-5; Defendants' Reply to Plaintiff's Opposition to Defendants' Separate [Proposed] Statement of Undisputed Facts and Conclusions of Law ("Defs.' Reply Facts"), ¶¶ 4-5; Pontacq Decl., ¶ 5.

[6]Pontacq Decl., ¶ 5.  See also Deposition of Angela Medina, Volume II ("Medina Depo. II") at 402:15-24 (acknowledging that Pontacq had the right to "take whatever steps he thought was necessary" to increase sales in her territory when it was underperforming).

1  regularly reconfigured underperforming territories to increase sales. By drawing new geographic

2  boundaries for a sales territory, he hoped to maximize the salesperson's ability to serve and grow

3  the business of existing clients and solicit new clients.[7] Pontacq represents that this was one of

4  his "most efficient" tactics, and notes that he has reconfigured the territories of salespersons who

5  were not pregnant.     [8]       Whenever   a   territory   is   reconfigured,   Yon-Ka   USA

6

_____

7  [7]Defs.' Facts, ¶ 7; Pontacq Decl., ¶ 6

8  [8]Pontacq Decl., ¶ 6. Medina offers a less benign reason for the reconfigurations. She
asserts that "[i]t was common knowledge among the Yon-Ka sales personnel that Pontacq would
9  'restructure' territories and assign and/or take away specific accounts according to his whim at
the time, and whether the specific sales person involved was currently on his 'blacklist.'" (Pl.'s
10  Facts, ¶ 7). As evidence of this, Medina offers the declarations of three former Yon-Ka
employees: Lisa Johnston, Sinead Norenius, and Scott Hannaway. See Declaration of Lisa
11  Johnston ("Johnston Decl."), ¶ 6 ("Herve was also known for re-configuring your territory if he
wanted you to fail or look bad. Obviously, he was in charge of mapping out which accounts
12  belonged to which territories, and he thus had the power to determine through re-configuration
13  whether you would succeed or fail"); Declaration of Sinead Norenius ("Norenius Decl."), ¶¶ 3-4
14  ("Herve was displeased with me at the time, so he also attempted to take a major account from
me – worth nearly $250,000 in sales per year – and assigned me to be in charge of the states of
15  Alaska, Wyoming and North Dakota, which were not good territories. [¶] This move on Herve's
16  part was an example of how he used his power of assigning accounts and territories to punish or
reward his sales people, depending on whether or not you were currently in his favor").
17  Defendants argue, and the court agrees, that Norenius and Johnston's statements are
18  inadmissible because they lack foundation, are not based on personal knowledge, and/or are
speculative and conclusory. Neither Norenius and Johnston offer facts to support the opinions
19  they offer. While Johnston suggests that Pontacq was "known" for reconfiguring sales territories
20  based on his like or dislike for a particular salesperson, and asserts that "[i]t was common
knowledge at Yon-Ka that Herve could turn on you for any small reason and put you on his
21  blacklist" (Johnston Decl., ¶ 4), she provides no factual foundation for these statements. See
22  *Vazquez v. Lopez-Rosario*, 134 F.3d 28, 33 (1st Cir.1998) (affirming the inadmissibility of
"hallway gossip" in a political discrimination case because "[e]vidence that is inadmissible at trial,
23  such as inadmissible hearsay, may not be considered on summary judgment"); *Evans v. McClain
of Georgia, Inc.*, 131 F.3d 957, 962 (11th Cir. 1997) (concluding that statements "based on
24  gossip, common knowledge, and . . . hearsay" were not significantly probative because there was
25  no indication that they could be reduced to admissible evidence at trial); *Allen-Cuffee v. Franklin
County Juvenile Detention Center*, No. 99CV00344, 2001 WL 242590, *11 (S.D. Ohio 2001)
26  (noting that "anecdotal evidence" based on "office gossip" was "inadmissible hearsay which
27  [could not] form the basis for a showing of pretext"); see also *Fedrick v. Goodyear Tire & Rubber
Co.*, CIV.A.H-93-4088, 1996 WL 585474, *4 (S.D. Tex. July 22, 1996) (plaintiff's allegations
28  of "common knowledge" were insufficient to prove that the manager who decided to demote him

1

2   had knowledge that other similarly-situated non-protected employees had engaged in the same

3   misconduct that led to the demotion).

4       Similarly, while Norenius recounts a personal experience with the reconfiguration of a
    sales territory, she offers no facts to support her self-serving opinion that Pontacq made the

5   change because he was displeased with her.  Norenius, for example, does not state that Pontacq

6   admitted such a motivation, nor that sales performance in the affected territory was adequate or
    above average.  Because she offers no facts supporting it, her opinion is inadmissible.  See *Hart*

7   *v. O'Brien*, 127 F.3d 424, 438 (5th Cir. 1997) ("Under Rule 602 [of the Federal Rules of

8   Evidence], lay witnesses may offer opinion testimony about matters of which they have personal
    knowledge. . . . This may include the motivation or intent of another person, if the witness has

9   an adequate basis for his or her opinion, such as personal knowledge or an opportunity to observe
    the surrounding circumstances. . ."); *Bornholdt v. Brady*, No. 87 Civ. 1062 (LMM), 1993 WL

10  339264, * 2 (S.D.N.Y. Sept. 2, 1993) ("To the extent that witnesses . . . will give nonhearsay

11  testimony of statements or actions of relevant decisionmakers showing age bias on the part of the
    government during the relevant period, the testimony is relevant.  To the extent that such

12  witnesses would give testimony merely of their subjective opinions or feelings about the existence
    of age bias, it is not"); see also FED.R.EVID. 701 ("If the witness is not testifying as an expert,

13  the witness' testimony in the form of opinions or inferences is limited to those opinions or
    inferences which are . . . rationally based on the perception of the witness. . .").  Defendants'

14  objections to the statements of Johnston and Norenius are therefore sustained.

15      Defendants move to strike Hannaway's declaration in its entirety on the grounds that
    Medina did not disclose him as a person "likely to have discoverable information that [she might]

16  use to support [her] claims. . . ."  FED.R.CIV.PROC. 26(a)(1)(A).  This request is granted.  Under

17  Rule 37(c)(1), "[a] party that without justification fails to disclose information required by Rule
    26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not,

18  unless such failure is harmless, permitted to use as evidence . . . on a motion any witness or
    information not so disclosed."  FED.R.CIV.PROC. 37(c)(1).  The Ninth Circuit has stated that Rule

19  37(c)(1) sanctions are "self-executing" and "automatic" unless the non-disclosing party shows that

20  its failure to disclose was "substantially justified or harmless."  *Yeti by Molly, Ltd. v. Deckers
    Outdoor Corp.*, 259 F.3d 1101, 1106 (9th Cir. 2001) (citing FED.R.CIV.P. 37 advisory committee

21  notes (1993)).

22      It is undisputed that Medina did not disclose Hannaway in her initial disclosures or in a
    later, amended disclosure.  Although Rule 26 exempts from the disclosure requirement individuals

23  whose testimony will be offered solely for impeachment, Hannaway is not in this category, as he

24  states that Medina told him she received an email from Pontacq stating that her pregnancy was
    "bad timing" or "inconvenient" for the company.  (Declaration of Scott Hannaway ("Hannaway

25  Decl."), ¶ 9).  Hannaway also reports purported statements by Pontacq regarding his dislike for

26  and distrust of pregnant women.  (*Id.*, ¶ 10).  Medina does not demonstrate that her failure to
    disclose Hannaway's name was "substantially justified," nor does she show that it was

27  "harmless."  In fact, Medina's failure to disclose Hannaway as a likely witness before defendants'
    summary judgment motion was filed prejudiced defendants by depriving them of an opportunity

28  to depose him.  Consequently, applying the standard set forth in Rule 37(c)(1) and *Yeti by Molly*,

1  recalculates sales goals to reflect the reconfiguration.[9]

2  **B.    Medina's Employment With Yon-Ka USA**

3  Medina has sold beauty products since 1984.[10] In September 2001, she began working for

4  Yon-Ka USA as a Western Division Sales Manager.[11]  She was based in El Segundo, California,

5  and earned a base salary and commissions; she received commissions, however, only if her

6  territories met their target sales goals.[12] During her initial job interview, Amy Waldorf, who later

7  became Medina's first supervisor, questioned her about her marital status and plans for having

8  children.[13]    In  November  2001,  Medina  became  Regional  Manager  of  a

9  ————————————

10  the court concludes that Hannaway's declaration must be excluded.

11  [9]Defs.' Facts, ¶ 9. Medina purports to dispute the fact but offers no argument or evidence

12  to contradict it.  (See Pl.'s Facts, ¶ 9).

13  [10]Pl.'s Facts, ¶ 103; Defs.' Reply Facts, ¶ 103.

14  [11]Defs.' Facts, ¶ 1; Pl.'s Facts, ¶ 1.

15  [12]Defs.' Facts, ¶ 2; Pl.'s Facts, ¶ 2.

16  [13]Pl.'s Facts, ¶ 106; Medina Decl., ¶ 8.  Defendants object to this statement on hearsay

17  and foundational grounds.  These objections are overruled.  Medina asserts that Waldorf asked
the questions of her during an interview; this is "sufficient to support a finding that the witness

18  has personal knowledge of the matter."  FED. R. EVID. 602. As for defendants' hearsay objection,

19  because Waldorf asked the questions during a hiring interview, i.e. within her scope of
employment for Yon-Ka, they constitute admissions of an agent of a party-opponent and are

20  admissible under Rule 801(d)(2)(D).  See Breneman v. Kennecott Corp., 799 F.2d 470, 473 (9th

21  Cir. 1986) (statement by an employee or agent of a party is admissible under Rule 801(d)(2)(D)
if the proffering party lays a foundation that shows the otherwise excludable statement relates to

22  a matter within the scope of the agent's employment); see also Harris v. Itzhaki, 183 F.3d 1043,
1054 (9th Cir. 1999) (same).

23  Defendants contend this fact is immaterial, as Waldorf was not a decision maker and did

24  not participate in reconfiguring Medina's territories, i.e. in the conduct constituting the alleged
constructive discharge.  The court agrees insofar as defendants argue that "stray comments" such

25  as Waldorf's do not give rise to triable issues regarding discriminatory intent.  See Horn v.
Cushman & Wakefield Western, Inc., 72 Cal.App.4th 798, 809 (1999) (an isolated, ambiguous

26  remark by a person who did not make the decision to terminate plaintiff, which was not made in

27  the context of plaintiff's termination, was entitled to virtually no weight in determining whether
the decision maker harbored discriminatory animus); see also Mageno v. Penske Trucking

28  Leasing, Inc., 213 F.3d 642, 2000 WL 300977, *3 (9th Cir. 2000) ("As a 'stray comment' that

1  territory that included Los Angeles, Orange, and San Diego Counties.  She also began managing

2  other sales people at this time.[14]

3      In 2002, Medina became pregnant for the first time; she took maternity leave from Yon-Ka

4

5  _____

6  is unrelated to the decision-making process, [the comment's] probative value falls short of
   establishing age discrimination"); *Turner v. North American Rubber, Inc.*, 979 F.2d 55, 59 (5th

7  Cir. 1992) (where "comments are vague and remote in time and administrative hierarchy, they
   are no more than stray remarks, which are insufficient to establish discrimination"); *Merrick v.*

8  *Farmers Ins. Group*, 892 F.2d 1434, 1438 (9th Cir. 1990) (stray comments unrelated to the
   decisional process were not sufficient to raise triable issues concerning the discriminatory nature

9  of a discharge).   Indeed, Medina does not rely on Waldorf's queries in asserting that summary

10  judgment should be denied.

11      Finally, defendants argue that the assertion is contradicted by Medina's deposition
   testimony, in which she purportedly stated that "prior to her second pregnancy, no one in the

12  company ever said anything inappropriate to her about being pregnant." (Defs.' Facts, ¶ 106).
   As evidence, they cite defendants' Fact No. 15, which states: "Plaintiff testified at deposition that

13  Mr. Pontacq did not say or do anything inappropriate during her first pregnancy." (Defs.' Facts,

14  ¶ 15; Pl.'s Facts, ¶ 15).  Fact No. 15 asserts only that Medina testified *Pontacq* did not say
   anything inappropriate to her about being pregnant; it does not support defendants' assertion that

15  *no one* said anything inappropriate about pregnancy.  Defendants cite the third session of Medina'
   deposition at pages 534:19-22 in support of Fact No. 15, but do not provide copies of the excerpt

16  for the court.  Consequently, this objection fails.

17      Medina also asserts that she "found out later that the Yon-Ka directors in France . . .
   didn't like to hire women of child-bearing ages," and that this sentiment was "well-known in the

18  New Jersey office." (Medina Decl., ¶ 93).  For the reasons stated in note 8, these statements lack

19  foundation and are speculative, as Medina, who did not work in the New Jersey office, does not
   indicate the source of her knowledge.  Medina acknowledges that most of Yon-Ka's employees

20  were women of child-bearing age (Medina Decl., ¶ 94), but notes that she was the only woman
   on the West Coast sales team with children, and the only one who became pregnant during her

21  time with Yon-Ka (*id*.).  These facts, however, do not demonstrate why there were no pregnant

22  women and/or parents among Yon-Ka's staff.  At her deposition, Medina explained that "Jessica"
   told her that "Delphine" said that the Muhlethaler sisters had commented that they disliked hiring

23  women of childbearing age because it was bad for business. (Medina Depo. III at 505:12-506:2).

24  This statement constitutes inadmissible triple hearsay, and demonstrates that Medina's statements
   regarding "common knowledge" in the New Jersey office are based on hearsay.  Defendants'

25  objections to this testimony are therefore sustained.   See also FED.R.CIV.PROC. 56(e)

26  ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such
   facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent

27  to testify to the matters stated therein").

28      [14]Defs.' Facts, ¶ 3; Pl.'s Facts, ¶ 3.

1   USA from September 22, 2002 to January 6, 2003.[15]  Defendants contend that Medina testified

2   Pontacq did not say or do anything inappropriate during her first pregnancy.[16]  Soon after her

3   return to work, Medina requested and received a change in position.[17]  She became Regional Sales

4   Manager for a sales territory covering greater Los Angeles and outlying counties.[18]  As Regional

5   Sales Manager, she was no longer responsible for supervising other employees.[19]  Her base salary

6   was reduced in accordance with a company policy that requires reduction of an employee's base

7   salary if she no longer supervises other employees.[20]

8

_____

9   [15]Defs.' Facts, ¶ 14; Pl.'s Facts, ¶ 14; Pontacq Decl., ¶ 16; Deposition of Angela Medina,
10  Volume I ("Medina Depo. I") at 186:18-20; Deposition of Angela Medina, Volume III ("Medina
    Depo. III") at 528:24-529:1.
11

12  [16]Defs.' Facts, 15; Pl.'s Facts, ¶ 15.  Defendants cite Medina Depo. III at 534:19-22 but
    fail to include the referenced pages in their exhibits.  Nonetheless, Medina does not dispute Fact
13  No. 15; she merely argues it is irrelevant.  The court disagrees, and finds the evidence relevant
    to rebutting Medina's assertion that Pontacq had a bias against pregnant women.
14
    In her declaration, Medina states that her immediate supervisor, Melinda Kriensky, told
15  her that, in response to news of her pregnancy, Waldorf and Pontacq questioned "where [her]
    priorities lay regarding [her] career with Yon-Ka." (Medina Decl., ¶ 20).  Defendants argue,
16  and the court agrees, that the statements by Waldorf and Pontacq constitute inadmissible double
    hearsay, as they are clearly offered for the truth of the matter. See also FED.R.CIV.PROC. 56(e)
17  ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such
    facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent
18  to testify to the matters stated therein").
19
    [17]Defs.' Facts, ¶ 16; Pl.'s Facts, ¶ 16.
20

21  [18]Defs.' Facts, ¶ 17; Pl.'s Facts, ¶ 17; Medina Depo. I at 187:8-14.

22  [19]Defs.' Facts, ¶ 18; Pl.'s Facts, ¶ 18.

23  [20]Defs.' Facts, ¶ 21; Pl.'s Facts, ¶ 21; Pontacq Decl., ¶ 17. Medina agrees that her salary
    was reduced, but disputes defendants' characterization of the change as a matter of company
24  policy, arguing that "[t]here are numerous examples showing that this is not true." (Pl.'s Facts,
    ¶ 20).  Because Medina does not argue that the salary reduction was a result of discrimination,
25  the reasons for the reduction are irrelevant to this motion. See Pl.'s Facts, ¶¶ 22-23 (agreeing
    that she "expected her base salary compensation to be reduced when she accepted the new position
26  because she would no longer be supervising employees and her responsibilities were reduced,"
27  acknowledging that "[s]he did not have a problem with the reduction in her pay," and noting that
    she accepted the new position believing that "reducing her territories would allow her to focus her
28

1   In March 2004, Medina's title was changed to Zone Leader, and she began to report

2   directly to Pontacq for the first time.[21]  In April 2004, Yon-Ka hired an account coordinator,

3   Jessica Burton, to support Medina.  Medina believed that Burton's presence would allow her to

4   spend more time on new client development and on expanding business from existing clients.[22]

5   At the time, Medina was the only Zone Leader with an account coordinator.[23]

6   **C.   First Territorial Reconfiguration, May 2004**

7   In May 2004, Medina's territory, which spanned eight counties and 180 accounts, was

8   reconfigured into three smaller territories: Metro LA1, Metro LA2, and Metro LA3.[24]

9   Defendants contend this reconfiguration was effected following discussions among Pontacq,

10  Francoise Muhlethaler (president of Yon-Ka France), and Muhlethaler's financial advisers.[25]

11  They believed the territory would be more profitable if it were divided into more compact,

12  manageable sales areas.[26]

13  Pontacq initially asked Medina to oversee Metro LA2 directly and manage the Regional

14  ————————————

15  attention on a smaller territory, increase her sales in the territory, and increase her service to
    existing clients").

16

17  [21]Defs.' Facts, ¶¶ 24-25; Pl.'s Facts, ¶¶ 24-25.

18  [22]Defs.' Facts, ¶¶ 26-29; Pl.'s Facts, ¶¶ 26-29.

19  [23]Defs.' Facts, ¶ 31; Pl.'s Facts, ¶ 31.

20  [24]Defs.' Facts, ¶ 33; Pontacq Decl., ¶¶ 22-23.

21  [25]Pontacq Decl., ¶ 22.

22
    [26]*Id.*, ¶ 23.  In her declaration, Medina indicates that her territory was split into four,
23  rather than three, smaller territories: Metro LA1, Metro LA2, Metro LA3, and Southwest.
    (Medina Decl., ¶ 33; Pl.'s Facts, ¶ 116).  Defendants dispute this testimony, asserting that it
24  contradicts Medina's deposition testimony.  (Defs.' Facts, ¶ 116, citing Medina Depo. I at
    210:21-211:4).  As defendants fail to attach the relevant deposition pages to their motion,
25  however, the court cannot determine whether the declaration in fact contradicts Medina's
26  deposition.  Moreover, whether there were three or four territories is immaterial.

27  Medina also disputes Pontacq's assertion that Yon-Ka believed her territory would be more
    profitable if reconfigured; however, she offers no evidence to suggest the existence of a genuine
28  dispute.

8

1   Sales Managers he planned to hire for Metro LA1 and Metro LA3.[27]  She declined because she

2   did not want a management role that would have required that she work more than a 40-hour

3   work week, as she was planning to have a second child.[28]  She and Pontacq ultimately agreed that

4   Medina would handle Metro LA2 and Metro LA3; Medina concedes that Pontacq was supportive

5   of her decision to work only two of the three areas.[29]  Medina testified that she was "fine" with

6   the reconfiguration decision because she was going to remain involved with "the old Central

7   West" territory she had cultivated.[30]  The company hired a new sales person, Judy Lu, to manage

8   the Metro LA1 territory.[31]

9   **D.   Loss Of The Regent Beverly Wilshire Hotel Account, July 2004**

10          The Regent Beverly Wilshire Hotel was an account within Medina's territory.  Pontacq

11   contends, in fact, that it was Yon-Ka USA's "most prestigious account."[32]  In July 2004, Pontacq

12   learned that Yon-Ka USA had lost the Regent Beverly Wilshire account.[33]  Medina acknowledged

13   at her deposition that "the responsibility was [hers]," as she was the salesperson on the account.[34]

14   _____

15          [27]Medina Decl., ¶ 35.

16          [28]*Id.*, ¶ 36; Medina Depo. I at 214:8-13.

17          [29]Defs.' Facts, ¶ 34; Pl.'s Facts, ¶ 34; Pontacq Decl., ¶ 25; Medina Depo. I at 217:14-16.

18          [30]Defs.' Facts, ¶ 35; Pl.'s Facts, ¶ 35; Medina Depo. I at 213:24-214:25.

19          [31]Defs.' Facts, ¶ 36; Pl.'s Facts, ¶36.

20

21          [32]Defs.' Facts, ¶ 38; Pontacq Decl., ¶ 27.  Medina disputes Pontacq's characterization of
     the account as Yon-Ka USA's "most prestigious," contending that the term is "ambiguous."  The
22   court does not find the term ambiguous, and Pontacq may offer his view of the importance of the
     account by characterizing it in this manner.  Medina also notes that the account was not always
23   in her territory and/or under her responsibility (Pl.'s Facts, ¶ 38).  She does not specify, however,
     when the account was removed from her territory.  In her declaration, she merely notes that the
24   Regent Beverly Wilshire Hotel "was once again reassigned to [her] Metro L.A. 2 &3 territories
     [in summer 2004] after being managed as an in-house account for a while."  (Medina Decl., ¶
25   45).

26          [33]Defs.' Facts, ¶ 39; Pl.'s Facts, ¶ 39; Pontacq Decl., ¶ 27.

27          [34]Medina Depo. II at 315:13-15.

28

1  In her declaration, however, she explains that the Regent Beverly Wilshire's spa director told her

2  in late July 2004 that the hotel would no longer carry Yon-Ka products because "they needed to

3  align themselves with products that were more exclusive than Yon-Ka's were."[35]

4       On August 9, 2004, Muhlethaler wrote Pontacq, noting her "total dismay and [s]hock" at

5  the loss of the Regent Beverly Wilshire account, which she characterized as Yon-Ka's "jewel

6  landmark account in the United States" and "by far the most mediatic [sic] establishment for our

7  company on this other side of the Atlantic ocean for our PR department."[36]  Muhlethaler asked

8  Pontacq to contact her "to provide [her] with more information as well as what sanctions [he]

9  intend[ed] to take towards the personnel of [his] responsible for this terrible negligence." [37]

10  Pontacq refused to sanction Medina.[38]

11       **E.     Fourth Quarter FY 2004 Sales Figures**

12       Yon-Ka's fiscal year begins on September 1 and ends on August 31.[39]  Medina performed

13  well during the first three quarters of fiscal year 2004,[40] but failed to meet her sales goals in the

14  fourth quarter.[41]  Pontacq found the results particularly troubling because the company had hired

15  an account coordinator to support Medina, thus incurring additional costs.[42]  It is undisputed that

16  _____

17       [35]Medina Decl., ¶ 52.

18       [36]Pontacq Decl., Exh. 27 (Letter from Muhlethaler to Pontacq, Aug. 9, 2004).

19       [37]*Id.*  Medina purports to dispute this fact, but offers no evidence to suggest the existence
20  of a genuine dispute.

21       [38]Pontacq Decl., ¶ 29.

22       [39]Defs.' Facts, ¶ 41; Pl.'s Facts, ¶ 41.

23       [40]Pontacq Decl., ¶ 31.

24       [41]Defs.' Facts, ¶ 42; Pl.'s Facts, ¶ 42; Pontacq Decl., ¶ 32.  Medina asserts that she "did
25  not have the 'added expense' of anything" as Pontacq was the one who decided to add an account
26  coordinator; thus, "if there were financial considerations involved, they were caused by Pontacq,
    not Plaintiff." (Pl.'s Facts, ¶ 43).  Whether it was Pontacq, Medina, or both who decided to add
27  an account coordinator is immaterial.

28       [42]Pontacq Decl., ¶ 43.

Pontacq did not communicate any such concerns to Medina.[43]  Pontacq compiled the following sales statistics from Yon-Ka's business records:[44]

| Yon-Ka USA FY 2003 and 2004 | | | | | | | |
|---|---|---|---|---|---|---|---|
| Territory | FY | Total after 3 quarters | Increase | 4th Quarter | Increase | Total after 4 quarters | Increase |
| Metro LA1 (Lu) | '04 | 562,721 | 12% | 227,305 | 18% | 790,027 | 14% |
|  | '03 | 502,815 | | 192,298 | | 695,113 | |
| Metro LA2 (Medina) | '04 | 382,519 | 5% | 114,639 | 9% | 497,157 | 6% |
|  | '03 | 362,768 | | 104,775 | | 467,542 | |
| Metro LA3 (Medina) | '04 | 402,440 | 17% | 125,179 | -16% | 527,619 | 7% |
|  | '03 | 345,502 | | 148,592 | | 494,094 | |

## F.   Sale-A-Thon Competition, September 2004

In September 2004, Medina flew to Yon-Ka USA's national headquarters in New Jersey to participate in a national Sale-A-Thon competition.[45]  Medina's presentation, which was to occur on the last day of the three-day Sale-A-Thon, was to be 50 minutes long, followed by a 10 minute question-and-answer session.[46]  On the event's first day, September 16, 2004, Pontacq told her that she would present the following day, and that her scheduled 50-minute talk would be shortened to 15 minutes.[47]  Medina placed last in the competition, which was judged and voted on by the Yon-Ka USA sales force.[48]

Both parties agree that Medina first told Pontacq about her pregnancy during the Sale-A-

---

[43]Pl.'s Facts, ¶ 127; Defs.' Facts, ¶ 127.

[44]Id., ¶ 33.

[45]Pontacq Decl., ¶ 35.

[46]Pl.'s Facts, ¶ 129; Defs.' Facts, ¶ 129.

[47]Pl.'s Facts, ¶ 129; Defs.' Facts, ¶ 129; Medina Decl., ¶ 60.

[48]Pontacq Decl., ¶ 35.

1    Thon event.  Medina asserts she informed Pontacq of her pregnancy on the first day of the

2    competition, and that "right after[ward]," Pontacq announced that she would present the following

3    day and that her presentation would be limited to 15 minutes. [49]  Medina contends she got the

4    distinct impression that [Pontacq] already knew" about her pregnancy before she told him the

5    news.[50]  Pontacq, by contrast, states that Medina informed him of the pregnancy "[a]t the end of

6    the competition."[51]

7         **G.      Sales Goals, September - November 2004**

8         At the end of September 2004, the Metro LA3 territory ranked 10th out of 17 territories

9    in terms of the percentage of sales goals attained, while the Metro LA2 territory ranked 14th.[52]

---

[49]Medina Decl., ¶ 60.

[50]*Id.*, ¶ 58; Pl.'s Facts, ¶ 128.  Defendants argue that Medina's "impression" is speculative and inadmissible.  (Defs.' Facts, ¶ 128).  The objection is overruled, as Medina is entitled to offer her opinion of Pontacq's reaction.  See FED.R.EVID. 701 (lay opinion testimony is permissible if it is "(a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue").

[51]Pontacq Decl., ¶ 35.  Medina asserts that she received an email from Pontacq in late September 2004 congratulating her on her pregnancy, but stating that the pregnancy was "bad" or "bad timing" for the company.  (Pl.'s Facts, ¶¶ 97, 131; Defs.' Facts, ¶¶ 97, 131; Medina Decl., ¶ 62).  Medina's declaration and deposition testimony regarding this subject is excluded for the reasons stated in an accompanying order sustaining defendants' objection to the evidence.

[52]Defs.' Facts, ¶ 45; Pl.'s Facts, ¶ 45; Pontacq Decl., ¶ 37.  Medina concedes the accuracy of these numbers, but argues they are irrelevant because Pontacq explained, upon introducing the company's quarterly performance tracking system, that quarterly tracking would give staff members more leeway in achieving their assigned goals.  (Medina Decl., ¶ 65).  She also asserts that "[t]here was an opinion amongst the sales team where they did not feel the urgency to stay on target on a monthly basis because being judged quarterly gave them a bit of a safety net of time to make up for sales."  (*Id.*).  Defendants object to this latter observation as speculative opinion testimony.  The objection is sustained.  As a Yon-Ka sales person, Medina has personal knowledge of how she interpreted the importance of the quarterly tracking system.  She does not, however, offer sufficient foundation for her statement regarding the general opinion of the sales staff, particularly because much of the staff was located across the country.  Medina's statements, moreover, do not establish that the monthly figures are irrelevant; indeed, even considered on a quarterly basis, the figures tend to support defendants' assertion that her performance was not strong.

1   By the end of October 2004, Metro LA 3 and LA2 ranked 13th and 14th respectively.[53]   When

2   November 2004 closed, Metro LA 2 and LA3 ranked 10th and 11th respectively.[54]   By contrast,

3   Metro LA1, managed by Lu, ranked 3d in September, 4th in October, and 1st in November.[55]

4   ## H.   Attempted Resignation, October 2004

5   Medina testified at deposition that she offered to resign in an October 20, 2004

6   conversation with Pontacq "out of frustration because [she] felt that [she] was doing everything

7   that [she] possibly could to make [her] numbers . . . [a]nd [she] felt that [Pontacq] . . . had begun

8   badgering [her]."[56]   Pontacq refused to accept Medina's resignation.   He said that he did not want

9   ―――――――――

10   [53]Defs.' Facts, ¶ 46; Pl.'s Facts, ¶ 46; Pontacq Decl., ¶ 37.

11   [54]Defs.' Facts, ¶ 47; Pl.'s Facts, ¶ 47; Pontacq Decl., ¶ 37.

12   [55]Defs.' Facts, ¶ 48; Pl.'s Facts, ¶ 48; Pontacq Decl., ¶ 38. Medina does not dispute this
13   fact, but argues that it is irrelevant because the three Metro LA territories are not comparable.
    Medina further alleges that Pontacq sent a number of emails in October designed to make her look
14   bad. On October 2, 2004, he purportedly sent an email to her and six other individuals captioned,
15   "operation 'reviving L.A. 2 & L.A. 3." In the email, Pontacq purportedly stated: "As you
    known, [reviving L.A. 2 & L.A. 3] is a topic of priority since I came to El Segundo, two months
16   ago." On October 20, 2004, Pontacq allegedly sent an email to Medina and Burton captioned
    "URGENT ALERT: METRO LA2/ METRO LA 3 DANGEROUS PERFORMANCE," which
17   stated his concern regarding sales and the lack of new accounts in these territories. (Pl.'s Facts,
18   ¶¶ 137, 139; Medina Decl., ¶¶ 66, 70). Defendants object to evidence of Pontacq's emails on
    the grounds that it violates the best evidence rule. This objection is sustained, as Medina has not
19   submitted the emails and the evidence is offered to "prove the content of [the] writing[s]." See
20   Fed.R.Evid. 1002; Hutchinson, 2004 Wl 1753391 at*2 & n. 1. See also Fed.R.Civ.Proc. 56(e)
    ("copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served
21   therewith"); ACandS, Inc., 5 F.3d at 1261 (applying Rule 56(e)).

22   [56]Medina Depo. II at 375:21-376:2. In her declaration, Medina offers a slightly different
    account of the conversation. She asserts that she contacted Pontacq on October 20, 2004 and
23   referenced the email he allegedly sent her in late September 2004. As noted, the court has
24   excluded evidence regarding the content of the email under the best evidence rule. Medina asserts
    that, after referencing the email, she told Pontacq that "he should be careful about what he says
25   regarding a sensitive issue like someone's pregnancy." She contends that Pontacq was defensive
    and that the conversation grew heated until, out of frustration, Medina said, "I quit – I'm doing
26   everything possible to reach my goals, and now you say my pregnancy's a problem. I'm not
27   going to let you make me feel bad for having a baby." (Medina Decl., ¶ 71). Defendants object
    to this evidence on foundational and hearsay grounds. The foundational objection is overruled.
28   Medina's declaration indicates that she participated in the conversation; this is "sufficient to

1

2    support a finding that the witness has personal knowledge of the matter." FED.R.EVID. 602. The

3    hearsay objection, however, is sustained to the extent that Medina recites an out-of-court

      statement offered to prove the truth of the matter asserted.  Although it is true that "hearsay

4    evidence produced in an affidavit opposing summary judgment may be considered if the out-of-

5    court declarant could later present that evidence through direct testimony, i.e. 'in a form that

      would be admissible at trial'" (*Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 465 n.

6    12 (3d Cir. 1989), there is no indication that Medina would be able to offer admissible evidence

7    at trial regarding her statements to Pontacq on October 20, 2004.

8              In *United States v. Tome*, 513 U.S. 150 (1995), the Supreme Court addressed the

      admissibility of prior, out-of-court statements offered by a witness who is present at trial and

9    subject to cross-examination. In particular, it focused on the scope of, and the reasoning behind,

10   Rule 801(d)(1)(B), which states that a prior statement by a witness is not hearsay if it is

      "consistent with the declarant's testimony and is offered to rebut an express or implied charge

11   against the declarant of recent fabrication or improper influence or motive." FED.R.EVID.

      801(d)(1)(B). Explaining the purpose of the rule, the Court stated:

12              "Noting the 'troublesome' logic of treating a witness' prior consistent statements

                as hearsay at all (because the declarant is present in court and subject to cross-

13              examination), the Advisory Committee decided to treat those consistent statements,

                once the preconditions of the Rule were satisfied, as nonhearsay and admissible as

14              substantive evidence, not just to rebut an attack on the witness' credibility." *Tome*,

15              513 U.S. at 157.

16   The Court emphasized, however, that "[t]he Rules do not accord this weighty, nonhearsay status

      to all prior consistent statements," but only to statements "offered to rebut a charge of 'recent

17   fabrication or improper influence or motive.'" *Id*. Prior consistent statements may not be

      admitted merely to "bolster[ ] the veracity of the story told" or "to bolster the witness merely

18   because she has been discredited." *Id*. at 157-58.

19              Relying in part on *Tome*, the Ninth Circuit in *United States v. Bao*, 189 F.3d 860 (9th Cir.

      1999), upheld a district court's decision to exclude a prior consistent statement by a witness

20   because the statement had been offered for the truth of the matter asserted and did not fall within

      Rule 801(d)(1)(B)'s strictures. Bao, a criminal defendant, argued that the trial court erred when

21   it excluded an exculpatory statement he made to a newspaper reporter prior to his arrest. At trial,

22   he testified that he did not know it was illegal to print counterfeit Microsoft manuals, a statement

      that contradicted his prior admission of guilt to police officers, and sought to admit a prior

23   statement to the newspaper reporter asserting that he "didn't know it was illegal." *Id*. at 868.

      The Ninth Circuit affirmed the district court's decision to exclude the prior statement as hearsay,

24   concluding that it was offered for the truth of the matter, i.e. that defendant did not know his

25   actions were illegal, and not to rebut a charge of fabrication or motive to lie. *Id*. at 865.

26              Here, Medina offers her prior statement at least in part for the truth of the matter asserted,

      i.e. that Pontacq said her pregnancy was a problem. She also offers it to "bolster[ ] the veracity

27   of [her] story." The statement therefore does not qualify as nonhearsay under Rule 801(d)(1)(B).

      Nor is it a prior statement that is "inconsistent with the declarant's testimony" or a statement "of

28   identification of a person made after perceiving the person." FED.R.EVID. 801(d)(1)(A),(B). The

14

1  her to resign, that he wanted to work with Medina to make her territory successful, and that he

2  wanted her to be successful.[57]

3  _____

4  statement must therefore be excluded as hearsay to the extent it is offered for the truth of the
matter asserted.

5      Although the statement would be admissible to show its effect on Pontacq, i.e., Pontacq's

6  state of mind and his motivation in refusing to accept Medina's resignation, Pontacq's state of
mind at the time he rejected Medina's resignation is not relevant because, as discussed *infra*,

7  Medina has not raised an inference of discriminatory animus.  Had Medina been able to show
discriminatory animus, Pontacq might argue that his refusal to accept her resignation rebuts any

8  suggestion that he targeted, or discriminated against, her.  Medina, in turn, might offer her

9  statements during the conversation as evidence that Pontacq sought to cover up his discriminatory
feelings by refusing to accept her resignation.  Because, however, Medina has not raised triable

10  issues of fact regarding the predicate to this chain of admissibility – i.e., evidence of

11  discriminatory animus – Pontacq's state of mind is not relevant and Medina's statements are not
admissible to prove it.

12

13      [57]Defs.' Facts, ¶ 50; Pl.'s Facts, ¶ 50; Medina Depo. II at 383:23-384:25; Pontacq Decl.,
¶ 44.  Medina asserts that the next day, on October 21, 2004, Pontacq sent an email to

14  "everyone" containing an update on two upcoming conferences.  According to Medina, the

15  conferences were important business opportunities to meet new prospects, and she expected to attend both,
first because she received an email from Pontacq on October 19, 2004 listing her name as a

16  participant, and second because she thought it would be natural to attend given Pontacq's
statement that he wanted her to open more new accounts. (Pl.'s Facts, ¶ 144; Medina Decl., ¶

17  80).

18      Citing *Coleman v. Quaker Oats Co.*, 232 F.3d 1271 (9th Cir. 2000), defendants argue that
this allegation must be excluded because it has been raised for the first time in opposition to their

19  summary judgment motion.  In *Coleman*, the court held that plaintiffs could not rely on a

20  disparate impact theory to defeat summary judgment, when they pled only disparate treatment in
their complaint.  *Id*. at 1292.  The court noted that "[a] complaint guides the parties' discovery,

21  putting the defendant on notice of the evidence it needs to adduce in order to defend against the
plaintiff's allegations.  A disparate impact theory . . . requires that the defendant develop entirely

22  different defenses, including the job relatedness of the challenged business practice or its business
necessity.  Neither of these [is] necessary to defend against a disparate treatment theory."  *Id*.

23  For that reason, the court concluded, plaintiffs' failure to plead a disparate impact theory unfairly

24  prejudiced defendant, and precluded reliance on such a theory at the summary judgment stage.
*Id*.  Unlike *Coleman*, Medina's allegations do not involve an entirely different theory of liability,

25  nor do they require the development of different defenses.  Medina's assertion that Pontacq

26  removed her name from the list of attendees at a conference where she might have developed sales
opportunities, merely lends factual support to her theory that defendants progressively denied her

27  opportunities to perform, and ultimately forced her resignation.

28      Defendants also object to Medina's statements regarding Pontacq's email on the grounds
that they violate Rule 1002 of the Federal Rules of Evidence.  This objection is sustained, as

1    Throughout October and November 2004, Medina and Pontacq conversed and exchanged

2 emails regarding Medina's sales figures.[58] Sometime in October 2004, Medina told Pontacq that

3 she was finding it difficult to open new accounts, [59] and Pontacq offered her the use of two

4 educators and a telemarketer to help her increase sales.[60] No other salesperson was assigned an

5 account coordinator, two educators, and a telemarketer.[61] On October 26, 2004, Medina wrote

6 Pontacq an email thanking him for his support.[62]

7    **I.    Second Territorial Reconfiguration**

8    By mid-December 2004, Metro LA2 and LA3 ranked 15th and 16th out of 17 territories

9 in terms of percentage of sales goals attained.[63] At her deposition, Medina acknowledged that

10 Pontacq had reason to be concerned about the performance of her territories.[64] She also testified

11 _____

12 Medina has not submitted the email and the evidence is offered to "prove the content of a

13 writing." See F ED.R.EVID. 1002; *Hutchinson*, 2004 Wl 1753391 at *2 & n. 1.   See also
FED.R.CIV.PROC. 56(e) ("copies of all papers or parts thereof referred to in an affidavit shall be

14 attached thereto or served therewith"); *ACandS, Inc.*, 5 F.3d at 1261.

15    [58]Defs.' Facts, ¶ 56; Pl.'s Facts, ¶ 56.

16    [59]Defs.' Facts, ¶ 57; Pl.'s Facts, ¶ 57.

17    [60]Defs.' Facts, ¶ 58; Pl.'s Facts, ¶ 58.

18    [61]Defs.' Facts, ¶ 60.   Medina does not dispute that these individuals were assigned to her.

19 She argues, however, that they "were of little or no value in that they were busy and did not have
time to devote to [her] needs."  (Pl.'s Facts, ¶ 60; Medina Decl., ¶¶ 74-78).   In particular,

20 Medina notes that educators "are not necessarily great salespeople or good at cold calling

21 prospective clients," that one of the educators "was extremely busy with her other duties," and
that the second educator managed to mail some invitations and get out in the field a couple of

22 times, but "all of her attempts proved to be futile."  (Medina Decl., ¶¶ 74-78).

23    [62]Defs.' Facts, ¶ 61; Pl.'s Facts, ¶ 61; Stein Decl., Exh. 16 (Email from Medina to

24 Pontacq, Oct. 26, 2004).

25    [63]Defs.' Facts, ¶ 62; Pl.'s Facts, ¶ 62; Pontacq Decl., ¶ 51.

26    [64]Defs.' Facts, ¶¶ 65-66; Medina Depo. II at 400:12-20 ("Q: In December of 2004 was

27 Mr. Pontacq telling you that he was concerned with the performance of your territories.  A: Yes
he was.  Q: And what do you think that the fact that your territories were 15th and 16th of 17

28 territories – as of mid-December, 2004 – was rightfully cause for Mr. Pontacq to have concerns

16

1   that Pontacq had the right to take whatever steps he believed were appropriate to increase sales

2   in her territories.

3          Muhlethaler continued to pressure Pontacq to take immediate steps to increase sales in

4   Medina's territories.[65]  In December 2004, Pontacq proposed that Medina's Metro LA2 territory

5   be reconfigured yet again, and that Metro LA2 and LA3 be joined into a single territory, renamed

6   Metro LA2.[66]  Defendants contend that Pontacq explained the proposed reconfiguration to Lu and

7   Medina, and told Medina that if her territory were smaller, she could focus on providing more

8   service to existing clients, and spend more time soliciting new business.[67]  He assured Medina that

9   the reconfiguration was not "punitive," but was designed to help the territory's sales grow.[68]

10         From December 16, 2004 through the first week of January 2005, Pontacq and Medina

11   repeatedly discussed the specifics of the reconfiguration. [69]  Medina proposed that 24 smaller

12   accounts be transferred from her territory to Metro LA1.[70]  In the end, 13 of her accounts were

13   transferred.  At her deposition, she characterized these 13 accounts as "smaller accounts" and

14

15   _____

16   about your territories?  A: Yes").

17         [65]Defs.' Facts, ¶ 63; Pl.'s Facts, ¶ 63; Pontacq Decl., ¶ 53.

18         [66]Pontacq Decl., ¶ 56.

19

20         [67]Defs.' Facts, ¶ 68; Pl.'s Facts, ¶ 68.  Medina does not dispute the explanation, but
     argues that it is irrelevant because it was "common knowledge" among sales personnel that
21   Pontacq would reconfigure territories according to his whims and feelings about the sales person
     involved.  As noted, these assertions are speculative.
22

23         [68]Defs.' Facts, ¶ 73; Pl.'s Facts, ¶ 73; Medina Depo. III at 644:8-10; Stein Decl., Exh.
     9 (Email from Pontacq to Medina, Dec. 16, 2004).  Medina does not dispute that Pontacq
24   reassured her; she argues, however, that the "reconfiguration was *indeed* punitive" and that it was
     "common knowledge" that Pontacq would restructure territories according to whim.  (Pl.'s Facts,
25   ¶ 73).  As noted, the evidence adduced regarding Pontacq's motivations is speculative and
     inadmissible.  See note 8.
26

27         [69]Pl.'s Facts, ¶ 152; Defs.' Facts, ¶ 152.

28         [70]Medina Depo. at 407:8-11.

1  indicated that she believed the reconfiguration was "a good strategy."[71]  Pontacq states that the

2  accounts were in the southernmost portion of Metro LA2 – i.e., the portion abutting Lu's Metro

3  LA1.  He asserts that the geographic area removed from Medina's Metro LA2 "was experiencing

4  a [tepid] sales time with not a single new account brought on board by [Medina] for more than

5  9 months."[72]

6      In her declaration, Medina contends that the transferred accounts made up 24 percent of

7  her sales for the first quarter of FY 2005.  The accounts were also partly responsible for a 13

8  percent growth that the territory experienced in the first quarter of FY 2005.    [73]    Medina

9  acknowledges that her sales goals were adjusted to reflect the change in her accounts.[74]

10      The reconfiguration plan, which transferred portions of Metro LA2 to Lu, and merged

11  Metro LA2 and LA3, was approved by Muhlethaler, who wrote Pontacq on December 31, 2004,

12  stating: "I fully support and validate the corporate decision related to the geographic revamping

13  of Metro LA1 and Metro LA2. . . .  Our concerns, as expressed to you on many occasions are

14  the totally inexplicable failing results of Metro LA 2 and Metro LA3, whereas all the other

---

[71]*Id.* at 408:1-4. .  Medina states that 14 accounts were actually transferred.  (Medina Decl., ¶ 98).  The specific number of accounts reallocated to Lu is irrelevant to this motion.

[72]Pontacq Decl., ¶ 55.

[73]Pls.' Facts, ¶ 155; Medina Decl., ¶ 97 ("On January 2, 2005, Pontacq sent an e-mail titled, 'Tiny Last Minute Revision for L.A. 1 & L.A. 2.'  This was the second e-mail with that title on that day.  This was his final decision made on this topic and contained two Excel attachments in which he listed individual accounts that were going to L.A. 1 and their past performance comparing the fiscal year 2004 to the current fiscal year 2005").  Defendants infer that Medina's statistics are drawn from these Excel documents, and argue that the evidence must be excluded because the Excel documents and the accompanying email are not attached to the declaration.  It is unclear whether the statistics were in fact drawn from the Excel documents, which, according to Medina's declaration, listed only accounts that were going to Metro LA1 and not Medina's total accounts.  Because her declaration does not indicate that she is attempting to prove the contents of a writing, and because Medina has personal knowledge of her accounts, she may competently testify to the percentage of sales represented by the 13 accounts transferred to Metro LA1.

[74]Defs.' Facts, ¶ 71; Pl.'s Facts, ¶ 71; Medina Depo II at 413:3-8.

1   territories nationwide are performing extremely well."[75]

2       Pontacq insists that he never told his supervisors in France that Medina was pregnant, and

3   asserts that he and his supervisors never discussed Medina's pregnancy at any time, much less in

4   connection with the performance of her territories.[76] Medina, however, points to a May 6, 2005

5   letter from Muhlethaler to Pontacq, in which she refers to Medina's "disability leave."[77]

6   **J.      Medina Takes Maternity Leave, February 2005**

7       By the end of January 2005, Medina's new Metro LA2 territory ranked 17th of 17 in terms

8   of percentage of sales goal attained.  Lu's Metro LA1, by contrast, was the top performing

9   territory.[78] In early February 2005, Yon-Ka France advised Pontacq that "unless [Metro LA2]

10  met its sales goals for the second quarter (*by the end of February 2005*), it was likely that Yon-Ka

11  USA would no longer be able to afford Burton's salary and [would] be forced to terminate

12  Burton's employment."[79]

13

14      [75]Pontacq Decl., Exh. 26 (Letter from Muhlethaler to Pontacq, Dec. 31, 2004).

15      [76]Pontacq Decl., ¶ 36.

16      [77]Pontacq Decl., Exh. 28 (Letter from Muhlethaler to Pontacq, May 6, 2005).  Defendants

17  explain that by May 2005, Pontacq's supervisors had learned that Medina had given birth two
    months earlier.  They assert, instead, that Yon-Ka France was not aware that Medina was
18  pregnant *before* she gave birth. (Defs.' Reply Facts, ¶ 75).  The evidence therefore establishes

19  that Yon-Ka France learned of Medina's pregnancy at some point before May 2005; it does not
    establish when or how that communication occurred.  The parties agree that Medina did not
20  communicate the fact to Yon-Ka France herself. (Defs.' Facts, ¶ 77; Pl.'s Facts, ¶ 77).  Because

21  Pontacq does not argue, at least for purposes of this motion, that it was France, and not he, who
    was responsible for the decisions leading to Medina's constructive discharge, this dispute is
22  immaterial.

23      [78]Defs.' Facts, ¶ 79; Pl.'s Facts, ¶ 79.  Medina does not dispute the facts, but argues that

24  they are irrelevant because the two territories are not comparable.

25      [79]Pontacq Decl., ¶ 61.  Medina argues that this statement is argumentative, self-serving,
    and based on hearsay.  She also contends that "[d]efendants have provided no declaration from
26  anyone in France stating under oath what they believed to be 'likely'." (Pl.'s Facts, ¶ 80).  The

27  hearsay objection is sustained to the extent the evidence is offered to prove the truth of the
    statement by Yon-Ka France to Pontacq.  It is admissible, however, to show Pontacq's
28  motivations and state of mind.

1    Sometime in February 2005, Pontacq learned that the Four Seasons Hotel had stopped

2  buying products from Yon-Ka USA in January 2005.[80]  Pontacq asserts that the Four Seasons

3  account was the "most prestigious hotel spa" in the Metro LA2 territory other than the previously

4  lost Regent Beverly Wilshire account.[81]  Nonetheless, he maintains that he again "stood up for

5  [Medina] to the parent company in France and refused to terminate [her] employment or discipline

6  her."[82]

7    On February 8, 2005, Pontacq told Medina for the first time that Yon-Ka France required

8  each territory to generate $120,000 in sales for each employee associated with it.  According to

9  Medina, "the L.A. 2 & 3 territories had met this requirement prior to the reconfiguration, and

10  for the final figures that marked the end of the first quarter of FY 2005."[83]

11    On February 10, 2005, Medina informed Yon-Ka USA that her doctor had placed her on

12  early maternity leave, effective immediately.[84]  Burton assumed responsibility for Metro LA2 and

13  reported directly to Pontacq.[85]  During Medina's maternity leave, Burton performed competently

14

15

---

16    [80]Defs.' Facts, ¶ 84; Pl.'s Facts, ¶ 84; Pontacq Decl., ¶ 70.  Although defendants indicate

17  that the loss of the Four Seasons account occurred in January 2004 (Defs.' Facts, ¶ 84), Pontacq's
     declaration states that it occurred in January 2005 (Pontacq Decl., ¶ 70).

18
     [81]Pontacq Decl., ¶ 70.  Medina argues that the reference to "most prestigious client" is

19  ambiguous.  (Pl.'s Facts, ¶ 84).  The court overrules this objection for the reasons stated in note

20  33.

21    [82]Pontacq Decl., ¶ 71.   Medina disputes this, contending that the statement is

22  argumentative, self-serving, and ambiguous in its reference to "stood up for."  The court
     overrules these objections.  The phrase "stood up for" – like many of the other terms Medina

23  denominates "ambiguous" – is not a legal term or a term of art, and adequately conveys Pontacq's
     state of mind and actions.

24
     [83]Medina Decl., ¶ 106.  It is unclear whether Metro LA 2 and LA 3 individually met the

25  $120,000 per employee benchmark, or whether it was the two territories combined that had sales

26  of $120,000.

27    [84]Defs.' Facts, ¶ 81; Pl.'s Facts, ¶ 81.

28    [85]Defs.' Facts, ¶ 82; Pl.'s Facts, ¶ 82.

and maintained sales in the territory.[86]  Medina gave birth on March 16, 2005.[87]  In April 2005, Burton told Pontacq that she did not want to return to being an account coordinator when Medina returned from maternity leave, and said that she wanted to become a Regional Sales Manager in charge of a territory.[88]  Pontacq believed that Burton would leave the company if she were returned to an account coordinator position.[89]

## K.    Third Territorial Reconfiguration

In April and May 2005, while discussing the Metro LA2 territory with his supervisors in France, Pontacq explained that Burton was performing well.  They agreed that – given Burton's performance, Pontacq's fear that she would leave the company if she continued as an account coordinator, and the prior performance of the Metro LA2 territory – the Metro LA2 territory should be further reconfigured.[90]  Under this plan, the territory was split to form Metro LA2 -

---

[86]Defs.' Facts, ¶ 86; Pl.'s Facts, ¶ 86; Pontacq Decl., ¶ 72.

[87]Pl.'s Facts, ¶ 93.  It is undisputed that Pontacq and Medina remained in contact regarding work matters during Medina's maternity leave.  (Pl.'s Facts, ¶ 164; Defs.' Facts, ¶ 164).  Although plaintiff's Fact No. 164 states that Medina "so feared for her job during her leave that she felt she had to remain 'in the loop,'" this assertion is not supported by the evidence she cites, i.e., Medina Decl., ¶ 113.  During her deposition, Medina indicated that she "always made herself available to everyone at the company" while she was on leave.  (Medina Depo. III at 522:12-15).  When asked whether she understood "if the company had any legal obligations regarding how much contact they could have with [her] when [she] was on maternity leave," Medina answered: "They didn't act like they did ever before.  They kept in constant contact with me throughout the first pregnancy.  So I just assumed that it would be like that for the second pregnancy."  (Medina Depo. III at 540:9-17).  This does not indicate that Medina agreed to permit such contacts because she feared for her job.

[88]Defs.' Facts, ¶ 87; Pontacq Decl., ¶ 76.  Medina objects to the evidence on hearsay grounds.  The objection is sustained to the extent the statement by Burton is offered for the truth of the matter.  It is admissible, however, to show Pontacq's motivations, beliefs, and state of mind.

[89]Defs.' Facts, ¶ 88.  Medina purports to dispute this statement but offers no evidence to suggest the existence of a genuine dispute.

[90]Defs.' Facts, ¶ 89; Pontacq Decl., ¶¶ 77-78, 82, Exh. 28 (Letter from Muhlethaler to Pontacq, May 6, 2005) (approving the reconfiguration).

21

West and Metro LA2 - East.  Burton was promoted to Regional Manager in charge of Metro LA2 - East and was to report to another supervisor.  Medina was to continue as Zone Leader for Metro LA - West and maintain her reporting relationship with Pontacq.[91]  Because Medina was no longer going to supervise Burton, her salary was reduced to reflect this fact.[92]  Pontacq advised Medina of the reconfiguration by email on May 7, 2005.[93]

On May 31, 2005, the day before Medina was scheduled to return to work, she notified the company of her resignation, effective June 1, 2005.[94]

## II. DISCUSSION

### A.   Standard Governing Motions For Summary Judgment

A motion for summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED.R.CIV.PROC. 56(c).  A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact.  See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Where the moving party

---

[91]Defs.' Facts, ¶ 90; Pl.'s Facts, ¶ 90.

[92]Defs.' Facts, ¶ 91.  Medina disputes that there was a company practice dictating a reduction in salary whenever an employee stopped supervising staff members. (Pls.' Facts, ¶ 92).

[93]Defs.' Facts, ¶ 93; Pl.'s Facts, ¶ 93; Pontacq Decl., ¶ 83; Stein Decl., Exh. 13 (Email from Pontacq to Medina, May 7, 2005).  Medina contends that Pontacq had Burton and Linda Donovan call her to find out her reaction to the changes.  He purportedly later asked Burton: "How did [Medina] take the changes?"  When Burton replied, "O.K.," he said, "Really?  She didn't say that she was going to quit?" (Medina Decl., ¶ 121).  This testimony is inadmissible double hearsay.  Although Medina does not indicate how she learned of the conversation, it clearly appears that she did not hear of it from Pontacq himself.  Whether she learned of it from Burton or Donovan, the statement is hearsay and inadmissible to prove such a conversation took place.

[94]Defs.' Facts, ¶ 94; Pl.'s Facts, ¶ 94.

1  will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that

2  no reasonable trier of fact could find other than for the moving party.  On an issue as to which

3  the nonmoving party will have the burden of proof, however, the movant can prevail merely by

4  pointing out that there is an absence of evidence to support the nonmoving party's case.  See *id.*

5  If the moving party meets its initial burden, the nonmoving party must set forth, by affidavit or

6  as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial."

7  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); FED.R.CIV.PROC. 56(e).

8      In judging evidence at the summary judgment stage, the court does not make credibility

9  determinations or weigh conflicting evidence.  Rather, it draws all inferences in the light most

10  favorable to the nonmoving party.  See *T.W. Electric Service, Inc. v. Pacific Electric Contractors*

11  *Ass'n*, 809 F.2d 626, 630-31 (9th Cir. 1987).  The evidence presented by the parties must be

12  admissible.  FED.R.CIV.PROC. 56(e).  Conclusory, speculative testimony in affidavits and moving

13  papers is insufficient to raise genuine issues of fact and defeat summary judgment.  See    *Falls*

14  *Riverway Realty, Inc. v. Niagara Falls*, 754 F.2d 49, 56 (2d Cir. 1985); *Thornhill Pub. Co., Inc.*

15  *v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

16      **B.      Standard Governing FEHA Discrimination Claims**

17      FEHA prohibits employers from discriminating against employees on certain enumerated

18  grounds, including on the basis of an employee's sex.  CAL. GOV'T. CODE §12940(a).  The statute

19  defines "sex" as including "pregnancy, childbirth, or medical conditions related to pregnancy or

20  childbirth."  CAL.GOV'T.CODE § 12926(p).  In evaluating discrimination claims under FEHA,

21  California looks to federal precedent governing analogous federal discrimination laws.  See *Guz*

22  *v. Bechtel Nat'l*, 24 Cal.4th 317, 354 (2000); *Caldwell v. Paramount Unified School District*,

23  41 Cal.App.4th 189, 195 (1995);  *Mixon v. FEHC*, 192 Cal.App.3d 1306, 1317 (1987).

24      Like Title VII and ADEA plaintiffs, a FEHA plaintiff may establish a prima facie case of

25  discrimination either by adducing direct evidence of discriminatory intent, or by satisfying her

26  burden under the *McDonnell Douglas* test.  See *Vasquez v. County of Los Angeles*, 349 F.3d 634,

27  640 (9th Cir. 2004) ("For a prima facie case, Vasquez must offer evidence that 'give[s] rise to

28  an inference of unlawful discrimination,' either through the framework set forth in *McDonnell*

1   *Douglas Corp. v. Green* or with direct or circumstantial evidence of discriminatory intent");

2   *Cordova v. State Farm Ins. Companies*, 124 F.3d 1145, 1148 (9th Cir. 1997) ("To establish a

3   prima facie case, a plaintiff must offer evidence that 'give[s] rise to an inference of unlawful

4   discrimination.' . . . 'The prima facie case may be based either on a presumption arising from

5   the factors such as those set forth in *McDonnell Douglas* . . . , or by more direct evidence of

6   discriminatory intent'"); *Wallis v. J.R. Simplot Co.*, 26 F.3d 885, 889 (9th Cir. 1994) ("The

7   prima facie case may be based either on a presumption arising from the factors such as those set

8   forth in *McDonnell Douglas Corp.* . . . or by more direct evidence of discriminatory intent"); see

9   *Guz*, 24 Cal.4th at 354 ("This so-called *McDonnell Douglas* test reflects the principle that direct

10  evidence of intentional discrimination is rare, and that such claims must usually be proved

11  circumstantially").[95]

12      Where plaintiff relies on circumstantial, as opposed to direct, evidence of discriminatory

13  intent, a burden-shifting analysis applies.  In *McDonnell Douglas Corp. v. Green*, the Supreme

14  Court held that the plaintiff carries the initial burden of establishing a prima facie case of

15  discrimination.  *McDonnell Douglas*, 411 U.S. at 802.  "The *prima facie* case, once established,

16  results in a 'presumption that the [defendant] unlawfully discriminated against the [plaintiff].'"

17   *Lessard v. Applied Risk Management*, 307 F.3d 1020, 1025 (9th Cir. 2002) (quoting *Texas*

18  *Department of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981)).  If plaintiff succeeds

19  _____

20      [95]The Supreme Court has stated that where a plaintiff adduces direct evidence of
    discrimination, the burden shifting test of *McDonnell Douglas* is not applicable.  See *Trans World*

21  *Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985) (noting that "the *McDonnell Douglas* test
    is inapplicable where the plaintiff presents direct evidence of discrimination").  The Ninth Circuit,

22  however, views direct evidence as an alternative means for a plaintiff to establish a prima facie

23  case under *McDonnell Douglas*.  See, e.g., *Vasquez*, 349 F.3d at 640 (stating that "[f]or a prima
    facie case," plaintiff must offer evidence supporting an inference of unlawful discrimination,

24  "either through the framework set forth in *McDonnell Douglas* . . . or with direct or

25  circumstantial evidence of discriminatory intent"); *Lowe v. City of Monrovia*, 775 F.2d 998, 1007
    (9th Cir. 1985) ("Because Lowe has met the four-part McDonnell Douglas requirements and

26  alternatively because she has provided direct and circumstantial evidence of discriminatory intent,

27  she established a prima facie case of disparate treatment on the basis of race").  Because plaintiff
    has not adduced direct evidence of discrimination in the instant case, the court need not address

28  the apparent dichotomy.

1   in proving a *prima facie* case, the burden shifts to the defendant to articulate a legitimate, non-

2   discriminatory reason for the employment action being challenged.  Assuming defendant carries

3   this burden, plaintiff must then demonstrate that defendant's asserted reason is pretextual.

4   *McDonnell Douglas*,  411 U.S. at 802, 804; see also *St. Mary's Honor Ctr. v. Hicks*, 509 U.S.

5   502, 511 (1993); *Burdine*, 450 U.S. at 252-53.

6            **1.    Evidentiary Rulings**

7            The court has sustained evidentiary objections to much of the evidence Medina offers to

8   establish that defendants acted with discriminatory animus.  This evidence includes: (1) Pontacq's

9   "pregnancy email,"[96]  (2) Kriensky's statement to Medina, after she announced her first

10  pregnancy, that Waldorf and Pontacq had questioned "where [her] priorities lay regarding [her]

11  career with Yon-Ka"; (3) Medina's assertion that she "found out later that the Yon-Ka directors

12  in France . . . didn't like to hire women of child-bearing ages," and that this sentiment was "well-

13  known in the New Jersey office"; (4) Medina's statement at her deposition that "Jessica" told her

14  "Delphine" said that the Muhlethaler sisters had commented that they disliked hiring women of

15  childbearing age because it was bad for business; (5) Hannaway's declaration; and (6) Medina's

16  statement that she told Pontacq that "he should be careful about what he says regarding a sensitive

17  issue like someone's pregnancy" and that, after the conversation got heated, she stated, "I quit

18  – I'm doing everything possible to reach my goals, and now you say my pregnancy's a problem.

19  I'm not going to let you make me feel bad for having a baby."[97]

20           A trial court can only consider admissible evidence in ruling on a motion for summary

21  judgment. See FED.R.CIV.PROC. 56(e); *Orr*, 285 F.3d at 773; *Beyene v. Coleman Sec. Servs.,*

22  *Inc.*, 854 F.2d 1179, 1181 (9th Cir. 1988).  Thus, in *Orr*, the Ninth Circuit affirmed a district

23  court's decision to exclude, at summary judgment, evidence offered by the non-moving party on

24  ──────────────

25       [96]The court sets forth its reasons for excluding Medina's testimony regarding this email in

26  an accompanying order that sustains defendants' evidentiary objection to the evidence.

27       [97]As noted, defendants' objection to this final statement is sustained to the extent it is

    offered to prove the truth of the matter asserted.  It is also sustained on relevance grounds to the

28  extent it is offered to show Pontacq's state of mind.

1    the grounds that the evidence was improperly authenticated and constituted hearsay.  See *Orr*, 285

2    F.3d at 771 (affirming the entry of summary judgment against plaintiff based on the district

3    court's finding "that most of the evidence submitted by Orr in support of her opposition to BOA's

4    motion for summary judgment was inadmissible due to inadequate authentication and hearsay");

5    see also *Los Angeles News Service v. CBS Broadcasting, Inc.*, 305 F.3d 924, 935-36 (9th Cir.

6    2002) (holding that the district court did not abuse its discretion in excluding hearsay evidence and

7    evidence that violated the best evidence rule in deciding a summary judgment motion), amended

8    and superceded on other grounds, 313 F.3d 1093 (9th Cir. 2002); *Groppi v. Barham*, 157 Fed.

9    Appx. 10, 11-12 (9th Cir. Nov. 14, 2005) (Unpub. Disp.) ("The district court did not abuse its

10   discretion in applying the best evidence rule to exclude Dr. Martin Keusten's declaration because

11   Groppi failed to provide the records upon which the declaration was based and failed otherwise

12   to explain their absence").

13       It is true that the United States Supreme Court has recognized that "Rule 56 does not

14   require the nonmoving party to depose her own witnesses," and for that reason, has held that the

15   evidence offered by the non-moving party at summary judgment need not be "in a form that

16   would be admissible at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  Evidence

17   offered in opposition to summary judgment must, however, comply with Rule 56's requirements.

18   See *Block v. City of Los Angeles*, 253 F.3d 410, 418-19 (9th Cir. 2001) ("To survive summary

19   judgment, a party does not necessarily have to produce evidence in a form that would be

20   admissible at trial, so long as the party satisfies the requirements of Federal Rules of Civil

21   Procedure 56").

22       Medina's evidence fails to comply with even this comparatively lenient requirement.  As

23   noted, Rule 56(e) states that affidavits must set forth facts that "would be admissible in evidence"

24   and that "copies of all papers or parts thereof referred to in an affidavit shall be attached thereto

25   or served therewith." FED.R.CIV.PROC. 56(e); see also *Orr*, 285 F.3d at 773 (evidence must be

26   admissible to be considered at summary judgment); *ACandS, Inc.*, 5 F.3d at 1261 ("Rule 56(e)

27   requires that documents relied upon in an affidavit presented in a summary judgment motion or

28   opposition thereto be attached to the affidavit"); *Blain's Helicopters*, 831 F.2d at 924 (rejecting

1  a party's argument that documents did not need to be authenticated to be considered in ruling on

2  a summary judgment motion, the court noted *Celotex*'s statement that evidence need not be in a

3  form that would be admissible at trial to be used in opposing summary judgment, but observed

4  that "[t]he *Celotex* court . . . was referring to the other means enumerated in Rule 56(c) for

5  persuading the court that summary judgment is inappropriate including affidavits, which are

6  evidence produced in a form that would not be admissible at trial. The quoted sentence upon

7  which Canada relies should not be read to allow evidence inadmissible in form if such evidence

8  is not allowed by Rule 56(c)").

9         Medina's references to the content of emails she received from Pontacq violate the best

10  evidence rule. Moreover, she has failed to attach copies of the emails to which she refers in her

11  declaration, including the "pregnancy email" on which she relies heavily to show discriminatory

12  animus.[98] Under Rule 56(e) and *ACandS*, therefore, evidence of the emails is inadmissible even

13  for summary judgment purposes. See *ACandS*, 5 F.3d at 1262 (district court did not abuse its

14  discretion in refusing to consider affidavits that referred to documents that were not attached);

15  *Peterson v. United States*, 694 F.2d 943, 945 (3d Cir. 1982) (failure to attach key document to

16  affidavit violated Rule 56(e) and made summary judgment improper).

17         In addition, Medina bases much of her declaration on hearsay evidence that will not be

18  admissible at trial. Medina will not, for example, be able to take the witness stand at trial and

19  recount statements that constitute hearsay, double hearsay, or triple hearsay. Compare *J.F.*

20  *Feeser, Inc. v. Serv-A-Portion, Inc*., 909 F.2d 1524, 1542 (3d Cir. 1990) (hearsay evidence

21  contained in an affidavit may be considered at summary judgment if the declarant could later

22  present the evidence through direct testimony); *Williams v. Borough of W. Chester*, 891 F.2d 458,

23

24      [98]Medina's opposition relies exclusively on two pieces of evidence to show discriminatory
animus: (1) Pontacq's "pregnancy email," and (2) Medina's assertion that she "found out later

25  that the Yon-Ka directors in France . . . didn't like to hire women of child-bearing ages," and that
this sentiment was "well-known in the New Jersey office." Both are inadmissible under Rule 56

26  – the pregnancy email because of the best evidence rule and the fact that Medina's declaration
does not attach a copy of the document, and the statement regarding "France" because Medina

27  lacks personal knowledge of the matter, failed to lay an adequate foundation for admission of the

28  testimony, and based the statement on double hearsay. See FED.R.CIV.PROC. 56(e).

1 465 n. 12 (3d Cir. 1989) ("hearsay evidence produced in an affidavit opposing summary judgment

2 may be considered if the out-of-court declarant could later present that evidence through direct

3 testimony, i.e. in a form that would be admissible at trial" (internal quotations omitted)).

4 Portions of her declaration, including her statement that she "found out later that the Yon-Ka

5 directors in France . . . didn't like to hire women of child-bearing age," and that this sentiment

6 was "well-known in the New Jersey office," also fail Rule 56(e)'s requirement that "affidavits

7 . . . be made on personal knowledge . . . [and] show affirmatively that the affiant is competent

8 to testify to the matters stated therein." FED.R.CIV.PROC. 56(e). Consequently, the court cannot

9 consider the evidence in determining whether Medina has raised triable issues of fact regarding

10 her discrimination claim.

11           2.     **Whether Medina Has Established A *Prima Facie* Case By Adducing**

12                     **Direct Evidence Of Discrimination**

13       Direct evidence is "evidence which, if believed, proves the fact [of discriminatory animus]

14 without inference or presumption." *Vasquez*, 349 F.3d at 640 (quoting *Godwin v. Hunt Wesson,*

15 *Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998) (alterations original)). "When the plaintiff offers

16 direct evidence of discriminatory motive, a triable issue as to the actual motivation of the

17 employer is created even if the evidence is not substantial." *Godwin*, 150 F.3d at 1221. As

18 evidence that her alleged constructive discharge was motivated by discriminatory animus, Medina

19 cites Pontacq's late September 2004 "pregnancy email," in which he purportedly said that her

20 pregnancy was "bad" or "bad timing" for the company. Medina has adduced no admissible

21 evidence of this communication, however, and the court therefore concludes that she has not

22 offered sufficient direct evidence of discrimination to prove a *prima facie* case. As a result,

23 Medina must make out a *prima facie* case of pregnancy discrimination through circumstantial

24 evidence, which is evaluated under the three-part test articulated in *McDonnell Douglas*.

25           3.     **Whether Medina Has Established A *Prima Facie* Case Under The**

26                     ***McDonnell Douglas* Framework**

27       Under the three-part burden-shifting scheme set forth in *McDonnell Douglas*, the amount

28 of proof necessary to establish a *prima facie* case at the summary judgment stage is minimal, and

1   need not rise to a preponderance of the evidence. *Wallis*, 26 F.3d at 888. Rather, plaintiff need

2   only adduce proof that "'gives rise to an inference of unlawful discrimination.'" *Id*. This

3   requires "very little" evidence. *Caldwell*, 41 Cal.App.4th at 197 (quoting *Sischo-Nownejad*, 934

4   F.2d at 1111).

5        *McDonnell Douglas*, a refusal to hire case, states that a plaintiff may establish a *prima*

6   *facie* case "by showing (i) that he belongs to a racial minority; (ii) that he applied and was

7   qualified for a job for which the employer was seeking applicants; (iii) that, despite his

8   qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and

9   the employer continued to seek applicants from persons of complainant's qualifications."

10  *McDonnell Douglas*, 411 U.S. at 802. The Court, however, cautioned against rigid application

11  of this test, noting that "facts necessarily will vary in [discrimination] cases, and the specification

12  above of the prima facie proof required from [plaintiff] is not necessarily applicable in every

13  respect to differing factual situations." *Id*. at 802 n. 13.

14       Courts evaluating discriminatory discharge claims have thus made various adjustments to

15  the *McDonnell Douglas* formulation. In *St. Mary's Honor Center v. Hicks*, 509 U.S. 502 (1993),

16  for example, the Supreme Court let stand "the District Court's finding that respondent satisfied

17  the minimal requirements of . . . a *prima facie* case by proving (1) that he is black, (2) that he

18  was qualified for the position of shift commander, (3) that he was demoted from that position and

19  ultimately discharged, and (4) that the position remained open and was ultimately filled by a white

20  man." *Id*. at 506. Other courts have required that plaintiff show that "(1) [she] belongs to a

21  protected class, (2) [she] was performing according to [her] employer's legitimate expectations,

22  (3) [she] suffered an adverse employment action, and (4) other employees with qualifications

23  similar to [her] own were treated more favorably." *Godwin*, 150 F.3d at 1220.

24       In *Guz v. Bechtel Nat., Inc.*, 24 Cal.4th 317 (2000), the California Supreme Court

25  synthesized these formulations into a general statement of the three-part test. It held that "the

26  plaintiff must provide evidence that (1) [she] was a member of a protected class, (2) [she] was

27  qualified for the position he sought or was performing competently in the position [she] held,

28  (3) [she] suffered an adverse employment action, such as termination, demotion, or denial of an

29

1   available job, and (4) some other circumstance suggests discriminatory motive." *Id.* at 355.

2        Defendants concede that Medina belongs to a protected class.  For purposes of this motion,

3   moreover, they do not challenge her assertion that she was constructively discharged.

4   Constructive discharge, if proven, can constitute adverse employment action.  *Grimes v. West*

5   *Group Co.*, 26 Fed. Appx. 641, 643 (9th Cir. Nov. 27, 2001) ) (Unpub. Disp.) ("If proven,

6   constructive discharge is legally equivalent to a termination, and therefore can constitute an

7   adverse employment decision for purposes of establishing a prima facie case of discrimination"

8   (internal citation omitted)); *Jordan v. Clark*, 847 F.2d 1368, 1377 n. 10 (9th Cir. 1988) ("If

9   shown, constructive discharge is an adverse employment action").

10        Defendants contend, however, that Medina cannot establish a *prima facie* case because (1)

11   she was not performing her job adequately at the time of the alleged constructive discharge and

12   (2) she cannot show that the employment actions constituting the alleged discharge occurred under

13   circumstances suggesting discriminatory intent.

14          **a.**    **Qualified   For   The   Position/Satisfying   The   Employer's**

15               **Expectations**

16        Defendants first argue that Medina was not performing her employment duties

17   satisfactorily, as evidenced by declining sales performance and the loss of the two "most

18   prestigious" accounts in her territory, the Regent Beverly Wilshire Hotel and the Four Seasons

19   Hotel.  Consequently, they assert, Medina cannot show that she was meeting Yon-Ka USA's

20   legitimate expectations.

21        Medina counters that she "was performing her job competently in that she was on leave

22   and not required to perform at all at the time of her constructive termination." [99]  In essence,

23   Medina contends that defendants may not rely on her performance prior to the commencement

24   of her maternity leave because she was on leave on May 31, 2005, the day she resigned her

25

26

27   _____

28       [99]Opp. at 17:26-28.

1   position with Yon-Ka USA.[100]  The court disagrees, not least because Medina expressly argues

2   that defendants, after learning of her pregnancy on September 16, 2004, deliberately

3   "orchestrated" her failure as a sales agent "[o]ver the ensuing months . . . by reconfiguring her

4   territory and taking many of her accounts away from her, all in a concerted effort to drive her out

5   of the company."[101]  In her complaint, Medina alleges that her constructive discharge resulted

6   from the following series of events, most of which occurred before she took maternity leave on

7   February 10, 2005:

8   •       After learning of her pregnancy on September 16, 2004, Pontacq sent her an email

9           telling her that her pregnancy was "bad" or "bad timing" for the company.[102]

10  •       In December 2004, Pontacq announced that he would reconfigure Medina's

11          territory and transfer a number of her accounts to Lu.  The reconfiguration went

12          into effect in early January 2005, causing Medina "to lose a number of her solid,

13          higher quality accounts."[103]

14  •       Pontacq then "proceeded to set up [Medina] for failure by stressing the importance

15          of inflated sales goals for the coming months and quarter."  According to Medina,

16          these goals "were virtually impossible to meet, especially considering the

17          restructuring of [Medina's] territory and loss of significant accounts."[104]

18  •       On her doctor's recommendation, Medina took early maternity leave on February

19  ───────────────────────

20      [100]See Opp. at 18:4-10 ("Defendants offer only a clumsy attempt to distract attention away
    from the time frame of Plaintiff's constructive discharge in *June 2005* by arguing that, in
21  *December 2004*, Plaintiff's sales were 'in decline' and that, after Plaintiff's termination, her
    replacement 'performed excellently.'  Needless to say, what was happening months *before*
22  Plaintiff was terminated, or *after* that point in time, is *irrelevant*" (emphasis original)).

23      [101]Opp. at 1:9-12.

24
        [102]Complaint, ¶ 11.  As noted, the evidence of this communication that Medina has
25  adduced is inadmissible under Rule 1002 of the Federal Rules of Evidence and Rule 56(e) of the
26  Federal Rules of Civil Procedure.

27      [103]*Id.*, ¶¶ 12, 14.

28      [104]*Id.*, ¶ 15.

1   10, 2005.[105]

2   • In early May 2005, while Medina was still on maternity leave, Pontacq

3   reconfigured her territory yet again, removed her former subordinate from her

4   supervision, and decreased her salary and bonus structure.[106] Medina submitted her

5   resignation on May 31, 2005.[107]

6   As these allegations make clear, Medina contends that Pontacq engaged in a months-long

7   scheme to ensure her poor performance by reconfiguring her territories multiple times and

8   removing key accounts from her portfolio. Whether Medina was performing adequately for

9   purposes of proving a *prima facie* case, therefore, must be assessed by looking to the period of

10   time during which these activities occurred, not by focusing on the actual date of Medina's

11   resignation. An employer need not ignore failing, pre-leave performance if that performance

12   gives it reason to terminate an employee, or, in this case, to criticize an employee's performance

13   and reconfigure her territories. See, e.g.,*Kohls v. Beverly Enterprises Wisconsin, Inc.*, 259 F.3d

14   799, 807 (7th Cir. 2001) ("Beverly has asserted that Kohls' deficiencies were the reason for her

15   termination and that she would have been terminated regardless of her [maternity] leave, and

16   Kohls has not presented sufficient evidence for a fact finder to conclude otherwise"); *Armstrong*

17   *v. Systems Unlimited, Inc.*, 75 Fed. Appx. 550 (8th Cir. Sept. 8, 2003) (Unpub. Disp.) (holding

18   that an employer was justified in demoting plaintiff after she returned from maternity leave

19   because plaintiff could not rebut the employer's evidence that she was having performance

20   problems before she went on leave and that additional performance problems were discovered

21   while she was on leave).

22   The question, however, is whether in this case the court should use as its formulation of

23   the second element of the *prima facie* case that Medina must show she was performing

24   satisfactorily, or to her employer's expectations, or rather whether it should require that she show

25   _____

26   [105]*Id.*, ¶ 16.

27   [106]*Id.*, ¶ 19.

28   [107]*Id.*, ¶ 22.

32

1  she was qualified for the position.  See *Guz*, 24 Cal.4th at 355 (permitting either formulation);

2  see also *Hicks*, 509 U.S. at 506 (plaintiff must establish that she was "qualified" for the position

3  from which she was removed); *Godwin*, 150 F.3d at 1220 (plaintiff must establish that she "was

4  performing according to [her] employer's legitimate expectations").  These differing formulations

5  highlight a lack of clarity in the case law as to whether evidence that supports a defendant's

6  rationale for taking adverse employment action – often, as in this case, a claim that the

7  employee's performance was poor – can also be used to defeat the employee's     *prima facie*

8  showing.  See, e.g., Lex K. Larson EMPLOYMENT DISCRIMINATION, § 808[2] at p. 8-119 (2000)

9  ("The qualification requirement [of the *prima facie* case] in a discharge context can [often]

10  become confused with the employer's showing of a legitimate nondiscriminatory reason for

11  discharge").

12      In *Caldwell*, the California Court of Appeal addressed the "adequate job performance"

13  versus "qualified for the position" dichotomy, citing *Davenport v. Riverview Gardens Sch. Dist.*,

14  30 F.3d 940 (8th Cir. 1994).  The Eighth Circuit in *Davenport* had criticized the district court's

15  formulation of the second prong of the *prima facie* case as "adequate job performance," stating:

16      "First, recognizing that the *prima facie* case in discrimination cases varies

17      somewhat with the specific facts of each case, we believe that the second element

18      in the present case should have been phrased in terms of whether plaintiff was

19      'qualified' for his position. . . .  Second, by requiring plaintiff to disprove the

20      alleged conduct violations in order to establish his *prima facie* case, the district

21      court essentially required plaintiff, at the outset, to disprove defendant's alleged

22      business reasons for its adverse employment action – in other words, to prove

23      pretext and the ultimate issue of intentional discrimination. The *prima facie* burden

24      is not so onerous.  Third, taken to its logical extreme, the district court's reasoning

25      could have ended the inquiry prematurely, thus denying plaintiff the opportunity

26      to show that, even if these incidents did occur, defendant unlawfully responded by

27      treating plaintiff differently from others who were similarly situated, on account

28      of his race.  We hold that plaintiff did show that he was qualified for the teaching

1    and coaching positions which he had held for several years, and that he therefore
2    met his burden of establishing the second element of his prima facie case, at least
3    to the extent necessary to withstand a motion for summary judgment." *Id.* at 944
4    (citations omitted).

5    While the *Caldwell* court adopted and applied a "satisfactory job performance" test on the facts
6    before it, it acknowledged that a "qualified for the position" test may be more appropriate in other
7    factual situations and observed in dicta that *Davenport*'s

8        "conclusion is consistent with *McDonnell Douglas*, where the Supreme Court stated
9        that the *prima facie* showing required in a given case must be consonant with the
10       facts of the case.  Whether the second element of a plaintiff's *prima facie* case of
11       employment discrimination is described as 'qualification for the position' or
12       'satisfactory job performance,' it is clear that, where a plaintiff claims not that he
13       was a model employee but only that other employees with equivalent foibles did not
14       suffer his fate, an employer cannot prevail simply by citing deficiencies in the
15       plaintiff's employment record." *Caldwell*, 41 Cal.App.4th at 200 n. 6.

16       The Ninth Circuit, too, has cautioned against an overly restrictive reading of the second
17   prong of the *McDonnell Douglas* test.  In *Aragon v. Republic Silver State Disposal Inc.*, 292 F.3d
18   654 (9th Cir. 2002), the court emphasized that "[t]he requisite degree of proof necessary to
19   establish a prima facie case . . . on summary judgment is *minimal*." *Id.* at 659 (quoting *Wallis*,
20   26 F.3d at 889 (alterations and emphasis original)).  The court then concluded that the district
21   court had erred by requiring plaintiff to show not only that he was qualified for the position, but
22   that "he was doing his job well enough to eliminate the possibility that he was laid off for
23   inadequate job performance." *Id.*  This analysis, the Ninth Circuit stated, "conflate[s] the
24   minimal inference needed to establish a prima facie case with the specific, substantial showing
25   Aragon must make at the third stage of the *McDonnell Douglas* inquiry to demonstrate that
26   Republic's reasons for laying him off were pretextual." *Id.*  Because plaintiff asserted that his
27   performance was equal to his coworkers, and showed that he had not received formal write-ups
28   for poor performance or disciplinary notices, the court held that he had "met his minimal prima

34

facie burden of establishing that he was qualified for the" position from which he was terminated. *Id.* at 660.  See also *Hire v. Hyperion Solutions Corp.*, No. CV-03-1744-ST, 2004 WL 2260669, *8 (D. Or. Oct. 7, 2004) ("Hyperion . . . contends that Hire was not qualified for her position because she failed to meet her sales quotas, especially her quota for the fourth quarter of fiscal year 2003.  This argument somewhat conflates the issue at the prima facie stage, where a plaintiff need only make a minimal showing that she is qualified, with the issue at the third stage that an employer's reasons were not pretextual, which a plaintiff can only overcome with a specific, substantial showing.  The Ninth Circuit has warned against conflating these two stages. *Aragon v. Rep. of Silver State Disposal*, 292 F.3d 654, 659 (9th Cir. 2002).  Indeed, in a case where the employer argued the plaintiff could not establish he was performing his job satisfactorily, the Ninth Circuit deferred discussion of that issue until the pretext stage.  *Messick* [*v. Horizon Indus. Inc.*, 62 F.3d 1227, 1229-30 (9th Cir. 1995)]").

Medina alleges that, after learning of her pregnancy on September 16, 2004, defendants deliberately "orchestrated" her failure "[o]ver the ensuing months . . . by reconfiguring her territory and taking many of her accounts away from her, all in a concerted effort to drive her out of the company."[108]  She also alleges that, after learning of her pregnancy,  Pontacq sent a number of emails singling her out for her poor performance, apparently in an effort to justify the territorial reconfiguration he announced in December 2004.  In essence, Medina argues that defendants deliberately documented a record of poor performance on her part after learning of her pregnancy in September 2004.  Given that defendants do not dispute for purposes of this motion that they constructively terminated Medina, the court finds that Medina has satisfied her minimal burden under the second prong of the *prima facie* test because she has shown that she was qualified for the position.

Medina was hired by Yon-Ka USA in September 2001 and apparently performed well for approximately three years.  During this time, she was promoted and assigned to manage subordinate salespersons.  Although she voluntarily relinquished her management role in March

---

[108]Opp. at 1:9-12.

1   2003, it is undisputed that Pontacq asked her to resume management responsibilities in April

2   2004, when he suggested that she oversee the newly created Metro LA 1, 2, and 3 territories.

3   In June and July 2004, Pontacq asked Medina to train several new hires: Burton, Lu, Hannaway

4   (a Zone Leader), and Johnston (a Regional Sales Manager).   This evidence establishes that

5   Medina was qualified for her position.  See *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564,

6   575-76 (6th Cir. 2003) ("The prima facie burden of showing that a plaintiff is qualified can

7   therefore be met by presenting credible evidence that his or her qualifications are at least

8   equivalent to the minimum objective criteria required for employment in the relevant field.

9   Although the specific qualifications will vary depending on the job in question, the inquiry should

10  focus on criteria such as the plaintiff's education, experience in the relevant industry, and

11  demonstrated possession of the required general skills"); *MacDonald v. E. Wyo. Mental Health*

12  *Ctr.*, 941 F.2d 1115, 1121 (10th Cir. 1991) (holding that a plaintiff can show that she is qualified

13  by presenting "credible evidence that she continued to possess the objective qualifications she held

14  when she was hired").

15          Defendants emphasize that Medina's sales performance had been declining since the fourth

16  quarter of FY 2004, which ended on August 31, 2004.[109]  Of 17 territories nationwide, her Metro

17  LA2 and LA3 territories ranked 10th and 14th at the end of September 2004, and dropped to 15th

18  and 16th by the end of December 2004, when Pontacq announced that he intended to reconfigure

19  Medina's territory and transfer 13 of her accounts to Lu.[110]  While this record of declining

20  performance might, in some cases, be sufficient to support a conclusion that plaintiff had not met

21  her minimal *prima facie* burden, it cannot have that effect here, where Medina alleges that, by

22  reconfiguring her territories and removing key accounts, defendants ensured that she performed

23  poorly.  Were the court to conclude that Medina had not proved a  *prima facie* case, it would

24  effectively prevent any analysis as to defendants' motivations for taking the actions they did. This

25

26          [109]Pontacq Decl., ¶ 31; Medina Depo. II at 400:12-20 (acknowledging that Pontacq had

27  cause to be concerned about the performance of her territories).

28          [110]Pontacq Decl., ¶¶ 37, 51.

1   would prevent a plaintiff such as Medina from ever proving discrimination based on

2   circumstantial evidence.

3                  **b.      Circumstances Suggesting Discriminatory Intent**

4          Defendants next argue that Medina "has no evidence that would suggest that Yon-Ka

5   USA's decision to reconfigure her territory after she was pregnant, or that Mr. Pontacq's reasons

6   for allegedly sending her emails regarding her poor performance, was because of her

7   pregnancy."[111] This argument is directed at the fourth prong of the *prima facie* test, which, under

8   *Guz*, requires that plaintiff show "some other circumstance suggest[ing] discriminatory motive."

9   *Guz*, 24 Cal.4th at 355. In cases alleging disparate treatment, this requirement is satisfied if

10  plaintiff shows that "other employees with qualifications similar to [her] own were treated more

11  favorably." *Godwin*, 150 F.3d at 1220. Where appropriate, the requirement may also be met

12  with evidence that the employee was terminated shortly after she revealed her protected status or

13  activity. See *Linder v. Pacific Dataware, Inc.*, 142 F.3d 444, 1998 WL 196688, *1 (9th Cir.

14  1998) (Unpub. Disp.) ("Because Linder established that (1) she was a member of a protected class

15  (she was pregnant), (2) she suffered an adverse employment action (she was fired) and (3) the

16  temporal proximity between informing her employer of her pregnancy and being fired supports

17  an inference of causation (six hours), Linder established a prima facie case of discrimination");

18  *Cleese v. Hewlett-Packard Co.*, 911 F.Supp. 1312, 1320 (D. Or. 1995) ("The fact that [plaintiff]

19  was terminated approximately one month after her pregnancy became known to Hewlett-Packard

20  is sufficient to raise a question concerning Hewlett-Packard's motives in terminating her").

21         Medina may rely on the temporal proximity between the date Pontacq learned of her

22  pregnancy and the onset of the events constituting the purported constructive discharge to satisfy

23  her burden of showing "some other circumstance suggest[ing] discriminatory motive."[112] *Guz*,

24  _____

25         [111]Reply at 10:19-22.

26         [112]In her opposition, Medina argues that she has satisfied the fourth prong of the *prima*

27  *facie* test by showing that she was "forced to resign only a few months after [Pontacq] made it
    known that [Medina's] pregnancy was 'bad' for the company" and "after [Yon-Ka] . . . made it

28  known that it did not favor female employees who had small children." (Opp. at 17:28-18:3).

1   24 Cal.4th at 355.  The evidence shows that Medina informed Pontacq of her pregnancy on
2   September 16, 2004.  In October and November, he repeatedly emphasized her poor performance
3   in emails and conversations.   In December 2004, Pontacq announced that he was going to
4   restructure Medina's territory.  The reconfiguration went into effect in January 2005, after which
5   Medina's performance continued to decline, in part, she alleges, because the restructuring stripped
6   her of her highest-performing accounts.  Medina began her maternity leave on February 10, 2005.
7   There were no further reconfigurations of the Metro LA territories until early May 2005, just a
8   few weeks before Medina was scheduled to return to work.

9          At the *prima facie* stage, where Medina need present only minimal evidence, this
10  chronology is sufficient to show "circumstance[s] suggest[ing] discriminatory motive." *Guz*, 24
11  Cal.4th at 355.  Although Medina did not resign until eight months after Pontacq learned of her
12  pregnancy, Medina argues, and the evidence suggests, that Pontacq took steps shortly after
13  September 16, 2004 to highlight the fact that her performance did not meet the company's
14  expectations, some of which had never been communicated before, and to cause her to fail by
15  reconfiguring her territory and removing high-performing accounts from her portfolio.  Drawing
16  all inferences in favor of Medina, the court concludes that this circumstantial evidence is sufficient
17  to satisfy Medina's minimal  *prima facie* burden, as it shows that the adverse actions that
18  constituted the alleged constructive discharge followed within a short time after Pontacq learned
19  of her pregnancy.

20              **4.      Defendants' Non-Discriminatory Explanation**

21          Having  concluded that Medina has established a       *prima facie* case of pregnancy
22  discrimination, the burden shifts to defendants to articulate a legitimate, non-discriminatory reason
23  for its adverse employment action.  *Burdine*, 450 U.S. at 255.  Defendants argue, and Medina
24  does not dispute, that they have satisfied this burden by adducing evidence that Medina's sales
25  performance had been lagging since the final quarter of FY 2004, which ended on August 31,
26
27  ———————————
28  As noted, this evidence is inadmissible because it constitutes hearsay, lacks foundation, violates
    the best evidence rule, and/or fails to comply with Rule 56(e).

38

1 | 2004.

2 | **5.    Whether Medina Has Raised A Triable Issue Of Fact Regarding Pretext**

3 |     To survive summary judgment, Medina must adduce evidence that defendants acted with

4 | discriminatory animus, or that their "proffered explanation is unworthy of credence." *Burdine*,

5 | 450 U.S. at 256; *Chuang v. University of California Davis, Board of Trustees*, 225 F.3d 1115,

6 | 1127 (9th Cir. 2000).  The evidence on which plaintiff relies need not be different than that which

7 | supports her *prima facie* case.  *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148

8 | (2000); *Snead v. Metropolitan Property & Casualty Ins. Co.* ,237 F.3d 1080, 1094 (9th Cir.

9 | 2001); *Chuang*, 225 F.3d at 1127.  When relying on circumstantial evidence to prove pretext, a

10 | plaintiff must produce specific and substantial evidence "that tends to show that the employer's

11 | proffered motives were not the actual motives because they are inconsistent or otherwise not

12 | believable." *Chuang*, 225 F.3d at 1222. See *Morgan*, 88 Cal.App.4th at 75 ("An employee in

13 | this situation cannot simply show the employer's decision was wrong, mistaken, or unwise.

14 | Rather, the employee must demonstrate such weaknesses, implausibilities, inconsistencies,

15 | incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that

16 | a reasonable factfinder could rationally find them unworthy of credence, . . . and hence infer that

17 | the employer did not act for the [. . . asserted] non-discriminatory reasons," quoting *Horn*, 72

18 | Cal.App.4th at 807 (internal quotations omitted)); see also *Guz*, 24 Cal.4th at 363 ("The

19 | authorities suggest that, in an appropriate case, an inference of dissembling may arise where the

20 | employer has given shifting, contradictory, implausible, uninformed, or factually baseless

21 | justifications for its actions").

22 |     As noted, the temporal proximity between the day Pontacq learned of Medina's pregnancy

23 | and subsequent, adverse employment events is sufficient to establish the fourth prong of the *prima*

24 | *facie* test.  To show pretext, however, temporal proximity is typically insufficient.  Rather,

25 | California courts require more, looking not only to "the timing of the company's termination

26 | decision," but to "the identity of the person making the decision, and the terminated employee's

27 | job performance before termination." *Flait v. North American Watch Corp.*, 3 Cal.App.4th 467,

28 | 479 (1992); see also *Hanson v. Lucky Stores, Inc.*, 74 Cal.App.4th 215, 224 (1999).  Pretext may

1   also be inferred by looking at "the plaintiff's job performance, the timing of events, and how the

2   plaintiff was treated in comparison to other workers." *Colarossi v. Coty US Inc.*, 97 Cal.App.4th

3   1142, 1153 (2002) (citing *Flait* and *Iwekaogwu v. City of Los Angeles*, 75 Cal.App.4th 803, 816

4   (1999)). Compare*Gemini Aluminum Corp.*, 122 Cal.App.4th at 1019-1020 (rejecting defendant's

5   argument that a FEHA plaintiff cannot establish a *prima facie* case of retaliation by adducing

6   "evidence of [the employer's] awareness of protected activity and the close timing of adverse

7   action," distinguishing cases holding that timing alone is insufficient to show that the employer's

8   stated, nondiscriminatory reasons are pretextual, and noting that the pretext cases were

9   inapplicable because "[a] discussion of pretext is premature until the employee establishes the

10   prima facie case and the employer offers a legitimate, nondiscriminatory reason for the adverse

11   employment action").

12       In *Flait*, plaintiff was fired "only four months" after he confronted the company president

13   for making offensive sexual remarks. *Flait*, 3 Cal.App.4th at 479-80. The court noted that the

14   president was the "sole person charged with the decision to terminate [plaintiff's] employment,"

15   and that "no one . . . could recall looking at [plaintiff's] sales or any other records before

16   terminating his employment." *Id*. It was undisputed that plaintiff's sales had increased by 60

17   percent immediately prior to his termination, and while he had received "a few verbal criticisms

18   of his methods in the past," those criticisms "were counterbalanced by compliments" regarding

19   his salesmanship." *Id*. at 480. Under these circumstances, the court found that the plaintiff had

20   raised a triable issue regarding pretext, which could be inferred from the timing of the termination

21   decision, the identity of the person making the decision, and plaintiff's job performance prior to

22   termination. *Id*. at 479-80.

23       The court in *Gemini Aluminum Corp.* found a sufficient showing of pretext under similar

24   circumstances. There, plaintiff was discharged just a week after he threatened to take his

25   religious discrimination complaint to the "labor board." *Id*. at 1023. According to the court,

26   "[m]ost telling was [plaintiff's] job performance before termination." *Id*. The record showed

27   that plaintiff had perfect attendance throughout his 15-month tenure with the company, worked

28   double shifts when necessary, and voluntarily put in 12-hour days. *Id*. Indeed, the company's

1  president had testified that he was "the most qualified and experienced individual he had ever

2  hired in his 45 years in the . . . business." *Id.* at 1024.  The court also found that the company's

3  proffered reason for the termination – that plaintiff had failed to submit documentation supporting

4  his request for a religious leave of absence – was not credible because it never asked plaintiff for

5  documentation. *Id.* at 1023.

6      By contrast, Medina acknowledges that her performance had been declining since the

7  fourth quarter of FY 2004.  By mid-December 2004, her Metro LA 2 and Metro LA 3 territories

8  ranked 15th and 16th out of 17 territories nationwide in terms of percentage of goals attained.

9  Medina herself acknowledges that Pontacq had reason to be concerned about the performance of

10  her territories, and testified that Pontacq had the right to take whatever steps he believed were

11  necessary to increase sales in her territories.  Although Medina argues that Pontacq reconfigures

12  territories "on [a] whim," she has adduced no probative evidence to controvert Pontacq's

13  assertion that he regularly reconfigures underperforming territories to maximize a sales person's

14  ability to solicit new clients and grow existing business.  She does not, for example, proffer

15  evidence of instances where Pontacq reconfigured territories even though they were performing

16  at or above expectations.  Indeed, Pontacq first reconfigured Medina's territory in May 2004,

17  before Medina became pregnant, because he believed that the territory would be more profitable

18  if it were divided into three smaller territories.  Medina testified that she was "fine" with this

19  reconfiguration, and does not argue that it led to her subsequent poor performance.  Indeed, she

20  acknowledges that her sales goals were adjusted after each reconfiguration.

21      It is also undisputed that Burton performed well during Medina's maternity leave.

22  Although Medina implies that Yon-Ka's desire to retain Burton was merely a pretext for the May

23  2005 territorial reconfiguration, she adduces no admissible evidence to suggest the stated reason

24  was pretextual.  Nor is the stated reason inherently lacking in credibility.  Given Medina's poor

25  track record in the months before she took maternity leave, Burton's satisfactory performance

26  during Medina's leave, and Pontacq's belief that Burton would leave the company if she were

27  returned to the account coordinator position, it was reasonable for Pontacq to try to maximize

28  staff resources by giving Burton sales opportunities and limiting the number of accounts Medina

1 | would manage upon her return.

2 |      Taken together, the circumstantial evidence of discriminatory intent in this case is weak

3 | and insufficient to carry Medina's burden of providing "specific and substantial" evidence of

4 | pretext. It is true that Pontacq criticized Medina's performance in the two months after he learned

5 | of her pregnancy, and announced that he would reconfigure her territory about four months after

6 | he heard the news. Given Medina's indisputably poor performance during this period and the

7 | complete lack of other probative evidence suggesting discriminatory animus, however, a

8 | reasonable jury could not conclude, based on the temporal proximity between these events, that

9 | the sales territories were reconfigured because of Medina's pregnancy and not because of her

10 | performance. Accordingly, the court finds that Medina's pregnancy discrimination claim fails

11 | as a matter of law.

12 | **C.    Medina's Remaining Claims**

13 |      The parties agree that Medina's remaining claims for wrongful discharge in violation of

14 | public policy, failure to prevent discrimination, retaliation, and violation of the Pregnancy Leave

15 | Act stand or fall with her pregnancy discrimination claim.[113] Because the court concludes that

16 | Medina cannot survive summary judgment on the pregnancy discrimination claim, it enters

17 | summary judgment against her on the remaining claims as well.

18 |

19 | **III. CONCLUSION**

20 |      For the foregoing reasons, defendants' motion for summary judgment is granted.

21 |

22 | DATED: February 7, 2007

23 |                             *Margaret M. Morrow*
                            MARGARET M. MORROW
                 UNITED STATES DISTRICT JUDGE

24 |

25 |

26 |

27 |

28 |      [113]Notice of Motion at 2; Mot. at 24-25; Opp. at 24-25.